**20 So.2d 551**

**PIZZOLATO v. LIVERPOOL & LONDON & GLOBE INS. CO., Limited.**

**No. 37167.**

Dec. 11, 1944.

St. Clair Adams & Son, of New Orleans, and C. V. St. Amant, of Donaldsonville, for defendant and appellant.

C. A. Blanchard, of Donaldsonville, for plaintiff and appellee.

ROGERS, Justice.

This is an action for the recovery of the amount of a policy of fire insurance, the statutory penalty, attorney's fees, and an

additional sum as damages for slander, libel and malicious prosecution. Defendant in its answer denied the alleged slander, libel and malicious prosecution and also denied any liability under the terms of the policy on the ground that plaintiff burned, or caused to be burned, the insured premises by some person or persons unknown to defendant for the purpose of collecting the amount of the policy. Plaintiff obtained judgment in the court below for the amount of the policy, together with the statutory penalty and attorney's fees, but was denied judgment on his claim for damages for the alleged slander, libel and malicious prosecution. Defendant has appealed from the judgment. Plaintiff has not appealed nor answered defendant's appeal.

The question in this case, as put at issue by the pleadings, is essentially one of fact and the sole fact to be determined on the appeal is whether the court below erred in rejecting the defense that the fire was of incendiary origin for which the plaintiff was responsible.

These are the facts: On June 30, 1937, the plaintiff purchased a tract of land measuring about two arpents front on Bayou Lafourche with the depth thereto belonging, situated about two miles below the City of Donaldsonville. Located on this tract of land was a double house sixty-five feet wide and ninety feet long, which was completely destroyed by fire on the night of November 26, 1940. At the time of the fire the house was covered by a policy of fire insurance for the sum of $1,500, issued in plaintiff's favor by the defendant company. The fire occurred between eight and nine o'clock at

night. When G. J. Mistretta, the Chief of the Fire Department of Donaldsonville, was notified of the fire he went immediately to the scene accompanied by Lorenzo Milano, a truck driver for the fire department. When they arrived there, the house was about to collapse and there was no chance to save the property. After the fire had burned itself out, Mistretta and Milano made an investigation of the premises, and in the yard back of and about fifteen or twenty feet from the house, they found a pile of burning rags, to which a piece of wire two feet long was tied. The end of the wire was attached to a piece of twine about one hundred to one hundred-fifty feet long which led over a hog pen into a corn field. At the end of the piece of twine they found two matches, one of which had been lighted and a flashlight smelling of kerosene. After completing their investigation at the scene of the fire, Mistretta and Milano returned to Donaldsonville for the purpose of questioning the negro occupants of the house. Later, Mistretta returned to the scene of the fire, where he met the plaintiff, who had driven there in his truck, in which he found a tarpaulin that smelled of oil. With the foregoing facts in his possession, Mistretta advised the office of the Fire Marshal in New Orleans of the fire and requested that an investigation thereof be made. The investigation was made the next day, resulting in a charge of arson against the plaintiff being made and presented to the grand jury by the district attorney. The grand jury refused to indict plaintiff returning the indictment, which had been prepared by the district attorney, with the words, "No true bill," endorsed thereon.

The defendant company having refused to pay the amount of the policy, this suit was filed. In his suit plaintiff claimed $1,500, the amount of the policy, 12% statutory penalty, and 25% attorney's fees. He also claimed $3,000 as damages for slander, libel and malicious prosecution as a result of the charge of arson made against him, which he alleged was instigated by the defendant.

Defendant in its answer admitted that the policy sued on was in existence; that the premiums were paid; that the property was totally destroyed by fire, and that due proof of loss was furnished. But defendant denied any liability under its insurance contract on the ground that the fire was set by the defendant or by someone in his employ with his consent and approval. Defendant further denied it was responsible 'for the charge of arson which had been made against plaintiff and averred that the charge was not instigated by it nor did it join in the prosecution of plaintiff thereon.

As we have hereinabove stated, we are not concerned on this appeal with plaintiff's claim for damages for slander, libel and malicious prosecution, which was rejected by the trial judge and apparently has been abandoned by plaintiff.

On the question which is before us for consideration, the law is well settled that in an action on a policy of fire insurance incendiarism is an affirmative defense and the burden to establish the defense rests upon the insurer. The law is equally well settled that in such a suit circumstantial evidence, as well as direct evidence, is admissible and that it is only necessary for the defendant insurer to establish its de-fense by a preponderance of the evidence. The circumstantial evidence, however, must do more than cast a mere suspicion of guilt on the insured in order to defeat his action for recovery under the policy. The facts and circumstances of this case, as well as of all other cases of a similar nature, must be governed by the foregoing legal principles. With those principles in mind, we have examined the record in order to determine whether the trial judge was justified, under the evidence, in rejecting the charge of incendiarism set up by the defendant company as a defense to plaintiff's action on the policy.

The defendant's contention that the fire was of an incendiary origin is based upon the physical facts revealed by the investigation made at the scene of the fire by Mistretta, the Chief, and Milano, an employee, of the Fire Department of Donaldsonville, and the opinion formed by Mistretta from the existence of those facts. After testifying about finding the bundle of burning rags, the wire and the string attached to the bundle, the flashlight and the tarpaulin in plaintiff's truck, Mistretta further testified, over plaintiff's objection, that in his opinion, "the method used—the house evidently was saturated with some oils, gasoline or kerosene, and this torch it is, soaked and placed in front of the house on the front porch and the string just passed through the house, and from the rear of the house pulled slowly through the rooms setting off one room to the other." Mistretta further testified he had been attending "fire schools" where he had been "studying methods used by men who would at-

tempt to destroy their homes or places of business, what we call fire bugs. We have been taught different methods that are used and this method has been used many times before * * *."

Defendant urges that the investigation conducted by Mistretta and Milano at the scene of the fire revealed a perfect "set-up" for an incendiary fire, the "set-up" consisting of a ball of waste material saturated with oil and bound with wire, the end of which was attached to a cord about one hundred fifty feet long that was traced over a hog pen into an adjoining field where two matches, one that had been lighted and one that was intact, and a flashlight were found, all of which emitted an odor of kerosene.

But the record is not convincing that the bundle of burning rags consisted of waste material or that it was saturated with oil. Milano testified about finding the bundle of rags which was burned so badly that the rags became nothing but shreds after one of the boys—Vernon Acosta and George Rodeillat—who directed attention to the burning bundle, stepped on it. He never identified the rags as consisting of waste material. On the contrary, he stated that the bundle attached to the wire "looked like a ball of rags." Mistretta testified that the bundle, which was reduced to ashes at the time his attention was directed to it, was probably waste material because of "the way it looked." He further expressed the opinion that if waste material be saturated with oil and burned for a certain length of time it will appear to be good until a person tries to put

it out when it will be found that nothing is left but ashes. But it appears to us that the same thing might be said of any bundle of rags saturated with oil that is left to burn for a sufficient length of time. However, Mistretta never testified positively that the bundle of rags consisted of waste material or that it was saturated with oil. He merely expressed an opinion that such was the case. He testified that he never saw the bundle of rags before, that he was unable to say to whom it belonged, or who placed it on the spot where it was found.

Mistretta was the only witness who testified about smelling oil in connection with the cord to which the bundle of rags was attached and the flashlight which was found by the two boys, Vernon Acosta and George Rodeillat, near the end of the string. So far as the cord is concerned, Mistretta stated that the only part of the cord that smelled of kerosene was the end which was close to the spot where the flashlight was found, not the end that was close to the burning rags. There was no showing by any of the witnesses that an odor of oil attached to the two matches which were found with the flashlight. The cord, flashlight and matches were not shown to be the property of plaintiff or that he had any knowledge of their existence.

It would seem to be clear that in those cases in which the method described by Mistretta is used to start fires of incendiary origin it would be necessary to open the doors of the building, to have the rags and oil available, and for the incendiary to pull the bundle of burning rags slowly through

the house so that they might come into contact with the oil or other inflammable material placed in the house.

Against the theory advanced by Mistretta on direct examination as to the origin of the fire in this case, he admitted, on cross-examination, that at the time he reached the scene of the fire the house was "pretty well gone"; that he was unable to state whether the doors of the building were open or not; that he was unable to determine that the house had been saturated with oil or that it contained other inflammable material. He stated that the bundle of rags attached to the wire and string were "just burned out" and that "they just beat them out and they fell in pieces." Mistretta ordered the two boys—Vernon Acosta and George Rodeillat—to follow the string attached to the bundle of burning rags, which the boys did. They came back with a flashlight and one burned and one unburned match. Mistretta testified that he did not know to whom the cord with the wire attached, the flashlight and the matches belonged or how they came to be at the place they were found.

After testifying that the house was "burned right to the ground" Mistretta was asked the following question: "In the condition in which you found it (the house) you couldn't tell how the fire started or where it started from?" His answer was: "No sir, not from the evidence we found." Later Mistretta testified he reported the matter to the sheriff's office because the fire looked to be suspicious. In expounding his theory as to how the fire occurred, Mis-

tretta does not explain why the supposed incendiary dragged the bundle of burning rags through the rooms of a building ninety feet long and sixty-five feet wide to a spot in the yard about fifteen or twenty feet from the building instead of leaving the burning rags in the building to serve as additional fuel for the fire. And we find it difficult to understand how a bundle of rags which was found to be burning about fifteen or twenty feet from the house, after the house itself was completely destroyed, could have been used to start the fire. It is more reasonable to believe that if that were a fact, the rags themselves would have been consumed by fire long before the house was burned to the ground.

The record fails to disclose any testimony to support defendant's contention that the tarpaulin found in plaintiff's truck when he reached the scene of the fire was saturated with kerosene. Mistretta testified on this point that the tarpaulin smelled of kerosene and "seemed to have been sort of damp,"—not that it was saturated with oil.

In view of the circumstances which created the suspicion in the mind of Mistretta, the Chief of the Fire Department, and in the minds of the representatives of the defendant company that the fire was of incendiary origin, it is insisted in the argument made on behalf of the defendant that if plaintiff himself did not set the fire, he paid Isaac Moten or Albert Cooper to do so.

Isaac Moten is a negro who was employed by the plaintiff. He lived with a woman, who was regarded as his wife, in one side

of the double house that was burned and he worked the land for plaintiff. On the night of the fire Moten was arrested and placed in jail by the sheriff. The next morning he was taken to the office downstairs in the jailhouse and interrogated as a witness in the course of the investigation that was conducted by representatives of the Fire Marshal. Moten also testified as a witness in this case.

In the argument for defendant much stress is placed on some discrepancies appearing in the testimony given by Moten on the investigation conducted on behalf of the Fire Marshal and the testimony which he gave in this case relative to the condition of the tarpaulin found in plaintiff's truck. On both occasions, Moten stated that the flashlight, which was exhibited to him while he was testifying was a shiny, nickle-plated article and that it was similar to a flashlight that was owned by plaintiff. Hence there was no discrepancy in his testimony in that respect. So far as the tarpaulin is concerned, Moten apparently testified under a vigorous examination in the jailhouse in the presence of two deputy fire marshals, the sheriff, two deputy sheriffs and the chief of police that the tarpaulin which was presented to him for that purpose smelled of coal-oil and that it was the first time he had ever smelled coal-oil on the tarpaulin. But in his testimony in this case, Moten stated that at the time of the investigation for the Fire Marshal, he could not smell any kerosene on the tarpaulin the night of the fire because he was suffering from a cold; that he could not have testified the tarpaulin did not smell of kerosene

before that time because if he did so he would be wrong as he had often smelled kerosene on the tarpaulin before that night. He testified in this case that there was kerosene on the tarpaulin all the time because the tarpaulin was used constantly to cover cans containing kerosene for delivery to plaintiff's customers and that the kerosene always "jumps out of the cans and wets the tarpaulin." We find no reason to disbelieve Moten's testimony on that point. It appears that plaintiff is engaged in operating a grocery store and meat market in Donaldsonville, and that in connection with the business he uses a truck to make periodical deliveries of groceries and oil to his customers. living in nearby communities. Plaintiff in his testimony corroborated the testimony of Moten with regard to the small piece of tarpaulin which was brought up to this. court in its original form. No effort was. made to conceal the tarpaulin which plaintiff explained he had owned for more than six years and that he used it in his delivery truck for the purpose of covering his oil deliveries so as to protect his grocery deliveries from the splashing of oil, and that as a consequence there was always an odor of kerosene attached to the tarpaulin. Plaintiff also testified that on the day prior to the one on which the fire occurred, he had made some deliveries of oil and groceries and that he had covered the cans containing the oil with the tarpaulin.

The record shows that Moten, who. worked on the place for plaintiff, assisted plaintiff on the day that the fire occurred to. butcher some cattle; that plaintiff gave the tripe taken from the cattle to Moten and his.

so-called wife, who cooked it in an open fireplace in the house, and that a bucket of water was thrown on the fire to put it out. Albert Cooper, a negro boy, who was a friend of Moten, helped plaintiff and Moten to dress the meat, receiving from plaintiff twenty-five cents for his services. The dressed meat was taken by plaintiff to Donaldsonville at about five o'clock in the evening. On this trip Moten, his so-called wife, and Albert Cooper accompanied plaintiff. On leaving the property plaintiff told Moten to leave the gate open because he, plaintiff, had to return with some bran to feed his hogs, as there was no feed on the place for the hogs. Plaintiff went back to the place with the feed for the hogs and, after feeding them, returned to his place of business in Donaldsonville at about six o'clock. He remained there until some time between eight or nine o'clock when some person informed him over the telephone that his house was on fire.

The evidence shows that Moten and his so-called wife were occasionally taken to Donaldsonville by plaintiff. At the time of the fire, Moten was in a gambling house across the street from plaintiff's store. Moten testified that Albert Cooper was also in the gambling house at the time. After plaintiff was notified of the fire, he went over to the gambling house and told Moten and Cooper that his place was on fire and Moten got into plaintiff's truck and went to the fire with him. Moten was asked on cross-examination by defendant's counsel the following question: "When you and your wife came into town with Paul Pizzolato did you bring any clothes with you?" His an-

swer was: "No, sir, nothing but my overcoat." Later Moten testified in answer to a direct question that he left every piece of his clothes in the house, except those he had on and his overcoat and that he was given "some kind of second hand clothes" which he paid for "at Mr. Tony's place."

The evidence shows that plaintiff owned the property for about seven years; that he paid $2,500 for it and had made some improvements on it since the purchase. Clarence Rivet, the former owner, testified that the only reason he sold the property was to avoid the foreclosure of a mortgage which rested on the property and that he had spent $1,600 in repairing the house in 1922. It was shown by the testimony of Mrs. Ernestine Sims, the owner of the Sims Insurance Agency of Donaldsonville, that she wrote the policy sued on; that it was a renewal of the policy which had been in their office for a number of years. It was further shown by the testimony of Mrs. Sims that she was well acquainted with the property and also with the plaintiff and that she considered plaintiff to be a good moral risk and that the defendant company had passed favorably upon the appraisement of the property. Moreover, the record shows that at the time the property was purchased by plaintiff it was insured through the same agency for $1,500 in the name of its then owner. From which it will appear that the property was considered by the defendant company and its local representative to be well worth the amount stipulated in the insurance policy and to be a good risk from that standpoint, as well as from the moral standing of the plaintiff.

Plaintiff, in his testimony, denied categorically that he owned the cord and flashlight which were found at the scene of the fire and both plaintiff and Moten denied that they had set the building on fire, or caused it to be set on fire. There was nothing peculiar about the flashlight. It was an ordinary nickle-plated one, numbers of which have been sold to and are in possession of innumerable persons. It is inconceivable that if plaintiff set his building on fire, or caused it to be set on fire, that he would have been so stupid as to leave at the scene of the fire, or to entrust to the person employed to set the fire, a flashlight which belonged to him and that he would have been so stupid as to fail to conceal or to destroy the tarpaulin covering a receptacle or receptacles containing oil that was used in setting the fire. Plaintiff affirmatively established that the insured property was fully paid for; that he also owned other property which was also paid for; that he was the proprietor of a successful business and had on deposit about $1,000 in a local bank, from which it is argued on behalf of plaintiff there was no necessity for plaintiff to burn his property in order to collect the insurance money.

The trial judge was not convinced that the fire was of incendiary origin. He thought that it might have well originated from the fire which had been made in the fireplace by Moten and his so-called wife in order to cook the tripe which had been given them by plaintiff and which Moten thought had been extinguished when he threw on it a bucket of water. The trial judge also found that no motive existed

for plaintiff to burn his property as it was worth more than the amount of the insurance stipulated in the policy; that he was the possessor of considerable cash and other property and was not in any financial trouble, and that he was regarded as a good moral risk.

In summing up his findings of fact, as set forth in his written reasons for judgment, the trial judge expresses himself in these words:

"The testimony, as stated before, shows that the policy was a renewal policy; that plaintiff was considered a good moral risk; that he had cash and considerable property; that the house was worth considerable more than the policy; that the flashlight, found in the field, did not belong to plaintiff; it was an ordinary nickel-plated one, and the Court has seen dozens of the same kind; that the tarpaulin found in the truck was used to cover oil deliveries and to protect the groceries from splashing oil. The foregoing testimony is plausible.

"The Court has carefully considered the evidence and in its opinion it does not show that the fire was set by plaintiff or by someone else in his employ, with his consent and approval. It might well be that the water thrown in the fireplace did not extinguish the fire and the fire originated there. No motive is shown to exist for the burning of the house."

The trial judge, after hearing the whole story as told by the witnesses for both plaintiff and defendant, rendered judgment for the full amount of the policy in favor of plaintiff and from our examination of the

record, the result of which we have herein-above set out in some detail, we find no reason to reverse his judgment.

The correctness of the amount awarded plaintiff as attorney's fees is not disputed by defendant and it is the mandatory duty of the court to inflict the statutory penalty of 12% of the total amount of the loss.

For the reasons assigned, the judgment appealed from is affirmed.