HAMITER, Justice.
 

 The instant litigation resulted from the total destruction by fire, during the early morning of February 16, 1954, of plaintiff’s residence and attached garage, together with the contents thereof which consisted of household furnishings and a 1953 model Plymouth automobile. Each of two separate policies, one issued by the Twin City Fire Insurance Company and the other by the Agricultural Insurance Company, insured the house and garage for $4,000 and the household furnishings for $1,000 (a total of $10,000). A third policy, issued by the Lafayette. Insurance Company, insured the automobile. At the time of the fire there existed a mortgage indebtedness on the house 'and garage of $3,893.68 and also one on the automobile of $1,705.80.
 

 Because of the refusal by the respective insurers to pay the total loss claims three suits were instituted against them. The first was filed by the holder of the chattel
 
 *665
 
 mortgage note affecting the automobile to recover the unpaid balance due thereon. In the other two suits Jerry Don Wells demanded payment for the loss of his house, garage and household furnishings, together with interest, statutory damages and attorneys’ fees.
 

 In separate answers the defendants specially pleaded arson, they alleging that “plaintiff fraudulently set fire to the in'sured property * * The insurers of the mortgaged house and garage additionally averred that under the provisions of their respective policies each had paid the mortgagee $1,946.84 (one-half the mortgage indebtedness remaining); and in reconvention they prayed for judgment against the plaintiff in the amounts of such payments, with recognition of the special mortgage assigned to them.
 

 All of the suits were consolidated and tried together, and at the conclusion of the trial the district court rendered separate judgments rejecting the several demands of the plaintiffs. It further decreed that the insurers of the mortgaged house and garage recover against plaintiff the amounts for which they respectively reconvened and that their special mortgage on the property be recognized.
 

 From the two judgments relating to the insurance on the house, garage and household furnishings Jerry Don Wells (plaintiff in the suits and owner of such property) appealed to this court. The appeals were docketed here under one number and will be considered and discussed together. (Because of the amount involved in the automobile insurance case the appeal from the judgment rendered therein was lodged in the Court of Appeal of the First Circuit, and we are not now concerned with it.)
 

 Plaintiff and the defendants agree, as is shown by the briefs of their respective counsel that the law governing cases of this nature is correctly enunciated in Sumrall v. Providence Washington Insurance Company, 221 La. 633, 60 So.2d 68, 69, as follows: “Inasmuch as the defense is arson, the burden rested upon the insurer to establish,
 
 by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it.
 
 It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in these instances, a finding for defendant is warranted
 
 where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire.
 
 (Here numerous cases are cited.) Accordingly, the questions presented in matters of this sort are answered by the particular facts of the controversy. * * ” (Italics ours.)
 

 Applicable here also are the following observations contained in Barbari
 
 *667
 
 v. Firemen’s Insurance Company, 107 So. 2d 480, 485 (a case decided by the Court of Appeal of the First Circuit and in which a writ of review, applied for by the defendant insurance companies, was denied by this court), to-wit: “It would appear that mere suspicion is not sufficient to show that a fire was of incendiary origin, the facts from which inference or presumption are drawn, must be established in evidence and the inference or presumption to which these proven facts give rise, must be strong and almost inevitable. They must be weighty, precise and consistent.”
 

 Accordingly, we must examine the facts of the instant case and determine whether they establish convincingly (1) that the fire was of incendiary origin and, if so, (2) that the plaintiff was responsible for it.
 

 The circumstances relating to the discovery of the fire, as well as to the pertinent events which immediately followed, are not seriously in dispute. Residing in the dwelling when it burned were plaintiff, who was the owner thereof and then twenty years of age, his widowed mother, and his young brother Nathan, aged two years and ten months at such time. The house was situated in Rosepine, Louisiana, a small community on Highway 171 between DeRidder and Leesville. Facing west, it sat approximately 100 feet east of such highway, its longest side running parallel thereto in a north-south direction. The garage, located at the north end of the structure, was connected by means of a breezeway. The respective bedrooms of plaintiff and his mother (adjacent but separated by a solid wall and two clothes closets) were at the south end, that of Mrs. Wells being on the front (or highway) side and that of plaintiff to its rear. No door opened between the two rooms.
 

 The fire was first discovered about 2:30 a. m., Tuesday, February 16, 1954, by John D. Cenci (a soldier stationed at Camp Polk near Leesville) and his wife who were passing on the highway and saw a flame in, and confined to, the garage. They stopped, and he walked toward the house; but on seeing someone in the breezeway, whom he could not identify as being plaintiff, he returned to the car to talk with his wife. Within a few minutes Edward L. Kaufman, who was driving a gasoline truck, also stopped to render assistance. Thereupon, the two men tried to arouse someone in plaintiff’s dwelling and, on failing to do so, went to a nearby house for the same purpose. When they returned to the burning structure and resumed heavy knocking plaintiff came from around its south end, being barefooted and clad only in pajamas, and called for help to rescue his mother. With him was his infant brother, Nathan.
 

 Momentarily thereafter Kaufman carried Nathan to Mrs. Cenci, who had remained seated in the car on the highway, so that
 
 *669
 
 she might care for him. (There is a conflict in the testimony of Kaufman and Cenci as to whether the former received the small boy from the arms of Cenci or from those of plaintiff. However, this conflict, seemingly unimportant, is understandable in view of the prevailing excitement.) And during Kaufman’s absence the plaintiff tore the screen from a window of his mother’s bedroom and entered such room. Cenci followed him.
 

 Cenci testified that on entering the room he saw Mrs. Wells on the floor, lying face down, and that his first thought was that she had been overcome by the smoke which was then very dense. He told plaintiff “Here is a body”; whereupon plaintiff stated that “Mother has killed herself and set the house on fire.”
 

 Cenci attempted to assist plaintiff in removing Mrs. Wells through the window, but his assistance was of no avail. He was compelled to leave the room because of the density of the smoke. Nevertheless, plaintiff remained there, all the while calling for help. And Kaufman, on his return from the Cenci car, climbed through the window and successfully aided plaintiff in getting the body outside.
 

 Later, the body was taken to DeRidder where an examination revealed that Mrs. Wells had been severely beaten about the head with a metal instrument and killed by the blows. The coroner set the time of her death at about 2:30 a. m.
 

 Meanwhile, the infant Nathan was carried by Kaufman from the Cenci car to the home of Mr. and Mrs. Richard H. Evans, located across the highway from the burning structure. Plaintiff also went to the Evans home; however, a short time later he was taken, at the suggestion of relatives and friends, to a hospital in De-Ridder for treatment.
 

 In his assigned written reasons for the judgments rendered, the district judge stated in part: “The defendants contend, and, of course, Wells denies, that he murdered his mother and set the fire in order to conceal the crime.”
 

 Obviously the theory underlying such contention, that plaintiff first murdered his mother and thereafter set fire to the dwelling, had for its purpose the supplying of a motive for the alleged arson — the affirmative defense urged. In this connection, and no doubt in support of that theory, defendants introduced evidence in an effort to prove that plaintiff killed his mother for the reason that she had opposed his drinking and his staying out late at night. However, with reference to such defense theory and adduced evidence the district judge said:
 

 “The many unexplained contradictions which resulted from Wells’ testimony in regard to the circumstances pertaining to the murder, lead, the Court to believe that his original plan
 
 *671
 
 did not contemplate the murder of his mother. * * *
 

 ******
 

 “That Jerry Don Wells bore a good reputation in his community for honesty and peacefulness cannot be doubted, * * *.
 

 “There was some testimony that he drank, but the most that can be said on that point is that he took a bottle or two of beer occasionally, and on one occasion, took one drink of whiskey. There is some testimony, by way of suggestion, that his mother had remonstrated with him about drinking and about staying out late at night, but the Court attributes no importance to either suggestion. Certainly there is nothing to indicate that he was drinking to excess, and surely, in all times, particularly, modern times, a 21 year old boy who is courting, stays out late at night, and I dare say mothers still remonstrate with them. It follows that the Court does not believe that either his drinking or his staying out late at night had anything to do with whether he did or didn’t set his house afire. * * * »
 

 We quite agree that there was a compíete lack of evidence to support defendants’ above mentioned theory.
 

 But the district -judge did find a motive for the alleged arson-^one -not advanced by the defendants. Thus, he stated: “ * * * The motive was to collect the difference between the amount of the mortgage note $3893.68, and the face of the insurance policies on the house, $10,000.00, or a net amount of $6,006.32, plus whatever equity that could be realized out of the car insurance over the amount of the chattel mortgage covering it.”
 

 Having failed to establish facts to sustain the theory advanced by them in the district court the defendants now urge us to affirm the judgments of the trial judge on the basis of the conclusions of fact reached by him. However, according to our appreciation of the voluminous record, and as will be pointed out hereinafter, several of the judge’s important and vital conclusions are not supported by the evidence adduced at the trial.
 

 To begin with there is a total lack of p.roof that the fire was of incendiary origin. No showing was made, as is usual in cases of this kind, of the presence of incendiary materials (rags, excelsior, paper, etc.) in or at the premises. Nor was any odor of combustibles noticed there or on plaintiff. Significantly, both Cenci and Kaufman went into Mrs. Wells’ bedroom before the fire had reached that area; Cenci had also gone through the back door and into the kitchen; Richard Evans (who lived across the highway) entered plaintiff’s bedroom at least twice to remove clothing; others were also in and about the house; yet no one
 
 *673
 
 told of having observed any unusual circumstances which might give rise to a conclusion that the house had been prepared for a fire.
 

 Neither was there any evidence that the fire broke out in several different parts of the house simultaneously. On the contrary the testimony of the witnesses who first arrived at the scene conclusively shows that the fire originated solely in the garage, and that it thereafter spread through the breezeway to the house.
 

 Again, some weeks after the occurrence in question a deputy fire marshal and a special agent in the arson department of the National Board of Fire Underwriters, both witnesses for the defendants, inspected the premises together. Yet the former was not even queried as to the cause of the fire; and the latter testified:
 

 “Q. Let me ask you this — were you able to tell at that time, from your search, or what you found of your investigation how the fire originated? A. Sir, that was the purpose of our investigations to inspect the premises. We couldn’t form any opinion as to how the fire originated, what caused, or under what circumstances it could and that was the first thing we did, was to check the premises before we interrogated anybody, and I have no opinion of that kind.
 

 *
 
 * * * * *
 

 “Q. Did you have an opinion after you inspected the premises? A. No sir.
 

 “Q. And you cannot say from what you learned of an inspection of the premises that it was incendiary in origin ? A. I cannot, sir.”
 

 True, one witness for the defendants, a Mrs. Madge McConnell who was a nurse at the DeRidder Hospital, testified during the trial that she noticed a pronounced odor of gasoline or kerosene on the body of Mrs. Wells when it was brought in. However, it is to be noted that she did not mention this to any of the law enforcement officers (coroner, sheriff, state police captain) who came to the hospital a short time later, and that at the coroner’s inquest she made reference to the odor as being
 
 not
 
 pronounced. Moreover, her testimony was completely negatived by that of the above mentioned officials who examined the body carefully about four o’clock in the morning (after its removal to a funeral home and before it was prepared for burial), they having testified emphatically that no odor of any combustible was noticed.
 

 It is true also that there was testimony that some hair on the back of one of plaintiff’s hands appeared to have been singed and that he could not give a reason for it. But in view of the time plaintiff remained in his mother’s room while attempting to remove her (after the fife had reached there) it is entirely possible, if not
 
 *675
 
 probable, that the singeing occurred then. Further, by reason of the excitement and urgency of the occasion it is not surprising that he did not later recall how it happened.
 

 Great stress is laid on plaintiff’s remark, when his mother’s body was discovered by Cenci and him, that “Mother has killed herself and set the house on fire.” With regard thereto he testified that he did not remember making it. But he freely admitted that such a thought did occur to him at the time, although on quieter reflection he knew of no reason why it should have done so. Assuming that plaintiff had nothing to do with the fire or the murder and that he awoke to find the house on fire and later his mother on the floor, as he continuously insisted, under the strain of the excitement and turmoil it is not inconceivable that all sorts of notions might have presented themselves to him. He, it is to be remembered, was not a mature, experienced individual; he was a very young
 
 man (20
 
 years of age at the time) with whom such a grave situation could easily produce, and perhaps did produce, extremely disturbing reactions.
 

 In reaching his conclusions that the fire was of incendiary origin the judge apparently assumed that it and the murder were connected and intentionally caused by the same person (a person believed by him to have been plaintiff). But we think that, in view of the evidence adduced, such an assumption is unwarranted. His comments on this phase were as follows: “ * * * While it matters not, insofar as consideration of this defense is concerned, whether arson or the murder first occurred, it appears to the Court that the necessity, as he (plaintiff) saw it, of the murder, arose unexpectedly. For instance,
 
 if
 
 his mother had awakened while he was in the act of setting the fire, (if she) had gone to the garage and caught him in the act, (if she) had attempted to prevent him from carrying his intention into effect and he had struck her, inflicting such a wound that he thought he had to finish the job in order to protect himself, and (if) she had fled back into her bedroom, he
 
 might
 
 have followed her there and finished the job there, and carried the iron bar, found on the garage floor after the fire and thought to be the death weapon, back to the garage and left it there, where it customarily stayed. * * * ” (Italics ours.)
 

 Of course, regarding the defense urged in the instant cases it does make a difference whether the murder or arson (if it were arson) was committed first. This is so for the reason that had the murder occurred first, as was the defendants’ original contention, it is difficult to believe that plaintiff (in an attempt to hide his crime) would set fire only to the garage — the farthest point from where lay the body which he was supposed to be trying to dispose of. True, he might ultimately have started a fire in the garage (if time permitted) and even in the kitchen and the living room; but most cer
 
 *677
 
 tainly he would have first fired the room where the primary evidence of his heinous alleged crime lay. On the other hand had plaintiff, as the trial court assumed, first set fire to the garage and later murdered his mother after she fled back to her room it would seem that (with arson being the principal motive on his mind) he would have fired his mother’s room also, thereby furthering his original intention and hiding the subsequent murder as well.
 

 There is present a circumstance which creates a suspicion that the fire was of incendiary origin, it being the almost simultaneous occurrence of the burning and the murder. But the law requires more than that suspicious circumstances be shown in order to sustain the burden of proof necessary in an arson defense. Pizzolotta v. Liverpool and London and Globe Insurance Company, Limited, 207 La. 101, 20 So.2d 551 and Barbari v. Firemen’s Insurance Company, supra.
 

 Besides the lack of evidence that the fire was of incendiary origin a motive, sufficient to warrant plaintiff’s burning his home, was not satisfactorily established. As we have indicated the trial judge found the motive to be the benefits from the insurance policies plaintiff would receive, he holding that the insured would get some $6,000 on the house over and above the mortgage indebtedness “plus whatever equity that could be realized out of the car insurance over the amount of the chattel mortgage covering it.” But in making that finding the judge overlooked several important facts which seem to negate any such motive.
 

 It is conceded that the car’s value (the maximum coverage under the insurance policy) did not exceed the amount due on the chattel mortgage note. Hence, plaintiff could not and would not receive any cash whatever as a result of the destruction of his automobile.
 

 Again, if plaintiff needed cash funds no doubt he could have easily and advantageously sold his dwelling (insured for $8,-000 and in which he had an equity in excess of $4,000) and his fully paid for household furnishings (insured for $2,000 and worth more than that amount) rather than have resorted to burning the property and killing his mother. Incidentally, the house consisted of three bedrooms, a living room, a dining room, a kitchen, a hall, a bath, a breezeway, and a paved garage; and it was only about one and one-half years old. Too, it was not certain that plaintiff would receive any cash funds from the insurance on his house and furnishings for, according to the. policies, the insurers had the option “to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time * *.”
 

 In further support of the motive which he found the trial judge pointed out that plaintiff was operating at an annual deficit of approximately $85 (total payments each
 
 *679
 
 year on house mortgage and car note of $1,921.48 and total net annual income of $1,836). And he then stated: “It is easy to see from these simple calculations that the outgo was more than the income, which is often the reason for insured wanting to cash in on an insurance policy.” To us it appears unbelievable that such a small annual operating deficit would be sufficient to motivate plaintiff to set fire to his house and thereby avoid such payments, particularly when he could have merely sold the car for the amount of the chattel mortgage and thus been relieved of paying $87 per month. Moreover, there seems to be even less motive for such act when it is considered that his mother, with whom he pooled resources in a joint bank account to take care of their living costs, received $72 per month from social security payments; and further that over and above his regular weekly salary of $54 plaintiff was given by his employer from time to time $50 per week on his being required to work away from Rosepine, during which periods he and some of his fellow employees would return to their respective homes at night (they traveling together in a single automobile), all in order to save part of that expense money.
 

 To be noticed also is that plaintiff’s indebtedness on his car was not in arrears at the time of the fire; and the house mortgage creditor testified that he considered plaintiff’s account with him completely satisfactory. Furthermore, there was not even an inference that plaintiff owed any other debts. Actually he and his mother had approximately $80 in their joint bank account when the fire occurred.
 

 With further reference to the conclusion that plaintiff had set fire to the garage and then killed his mother the trial judge, in reaching it, reasoned that plaintiff had maintained that he remained asleep despite the noise made by Cenci and Kaufman in trying to arouse some one in the house and, further, notwithstanding that his mother was brutally beaten to death in her adjoining bedroom and “only a partition separated his room from his mother’s room.” Insofar as the difficulty encountered in arousing plaintiff is concerned, it is common knowledge that many persons are sound sleepers and require the greatest efforts to be aroused. In fact, the mentioned witnesses had the same difficulty in trying unsuccessfully to arouse the next door neighbors. As to the other circumstance relied on, even though it is true that plaintiff’s room adjoined that of his mother, the judge failed to note that the separation between the two rooms consisted not only of a partition but also of two adjacent clothes closets along the entire wall, one opening into each room. That such a condition creates an extremely effective sound barrier cannot be disputed, and it could well have prevented noises emanating in Mrs. Wells’ room from being heard in that of the plaintiff.
 

 
 *681
 
 Also relied on in support of the judgments rendered was the circumstance that when Richard Evans opened a drawer in plaintiff’s room, for the purpose of removing some clothes, he found therein a lighted battery hunting light. But plaintiff satisfactorily demonstrated during the trial that the light was defective by reason of a short therein which caused it to come on at a slight jar.
 

 The judge, in his reasons for the judgments, further pointed out that 'a certain expert witness (Ray Heard, laboratory criminologist for the Louisiana State Police Department) testified that . some of the blood found on plaintiff’s pajama coat, both front and back, appeared to have been in the form of splattered- or flying droplets which could have resulted from his hitting some one over the head. But the witness qualified his testimony by saying that the condition could have arisen only if the blows had been of sufficient severity and if the two persons had been at a proper angle relative to each other. And when asked whether the blood spots on the back could have fallen there if the person doing the hitting was standing and facing the one struck, he responded: “It would certainly be difficult and I doubt if those stains got ■on there — they couldn’t very well get there If you stayed in the position you are in now. * * * it would be extremely difficult, for those stains back there would very likely not have occurred.”
 

 The expert witness also testified that the blood could have splattered on plaintiff when the body was being ejected from the window. Further, both he and the coroner (Dr. Broyles) said that if the blood had fallen on the back of plaintiff’s pajama coat in the manner contended for by defendants some would have fallen also on his face and hair. Yet not one of the investigating officers observed any blood on his face or hair shortly after his arrival at the hospital, although he was then examined closely by them. And it was not said by any of those officials that his face and hair had been recently washed.
 

 With reference to plaintiff’s explanation that he obtained the blood on his pajamas when he was trying to get his mother out of the house, the trial judge commented: “ * * * Moreover, Cenci helped Wells handle the body, in fact carried the head, while Wells carried the feet, but the record is silent as to any blood having gotten on Cenci, smeared or splattered. Kaufman helped Wells remove the body from the house and testified he got no blood on him, smeared or splattered. If the blood had been gushing from the wounds when they had hold of the body, the only times, according to Wells, that he came in contact with it, and Wells had then gotten the specks of blood on the back of the pajama tops, does it not stand to reason, some of it would have fallen on them also ? ” In making these deductions the judge overlooked the fact that when Kaufman helped
 
 *683
 
 remove the. body he held only the feet and legs and that plaintiff gripped the upper part thereof. And even more important Cenci affirmatively testified that he did have blood on his clothes after coming out of the house. Thus, he said: “I didn’t realize she was dead until I went to the car. I saw the blood on my pants and the truck driver told me she shot herself.” It is pertinent to note also that neither Cenci nor Kaufman observed any blood on plaintiff prior to his entering his mother’s bedroom, a fact not mentioned by the district judge.
 

 Again, the judge was much impressed with the testimony of certain witnesses (the examining law enforcement officers) to the effect that in their opinion plaintiff, while at the hospital, “was faking or feigning hysteria”. But when the officers were asked to give the reason for their believing that plaintiff was “putting on” they said merely that he would appear to be quiet for awhile and then begin to cry or sob or tend to become hysterical. We fail to find anything unusual in such demeanor, particularly in view of the terrific ordeal which plaintiff had just experienced and of the fact that he was then in the hospital barefooted, in his bloody pajamas, and with questions being propounded to him. Furthermore, at the time of the examination by the officials he was under heavy sedation, several grains of a certain barbiturate having been given to him shortly prior thereto,
 

 Great weight was given by the district judge to the testimony of Mrs. Richard Evans that some minutes after the infant Nathan (two years, ten months of age) was brought to her house such child, while seated in her lap, stated that Jerry was whipping his mother with his hand and that “ * * * he whipped her and she fell down, and the blood came out of her mouth.” Because of the circumstances hereafter described we can give little credence, if any, to the testimony of Mrs. Evans. It is conceded that at the time of the fire and for some months prior thereto she was very ill and highly nervous. Her condition was such that when she first saw the fire in the garage she became so hysterical that her husband had to take her from their front porch into the house and get her quieted before he could lend his assistance at the burning dwelling. Kaufman said that when he came over with Nathan and told Mrs. Evans of her sister’s death “she went all to pieces.” And Mrs. Evans admitted that she was upset and crying so much that Nathan had to quiet her before he made the statements attributed to him. She further admitted that she told no one except her husband about the child’s alleged statements until some seven or eight months later — after these insurance suits were filed. In this connection it is well to note that immediately after the fire Sheriff Craft, in making an investigation, specif
 
 *685
 
 ically asked Mrs. Evans whether Nathan had said anything in her presence about the occurrence, and she told him “No”. Moreover, the emotional condition of the child at the time (everyone who saw him stated that he was calm, not excited, not crying) would seem to deny the fact that he had just witnessed the brutal beating of his mother. Too, several other relatives of the decedent testified that they were with Nathan shortly after the dwelling burned and that he had not mentioned to them any act of whipping by plaintiff, although he did refer to the< fire, f
 

 The district judge, in rendering his judgments, made reference to other circumstances which we deem unnecessary to discuss because they appear to be unimportant in deciding these cases. Suffice it to say that from our careful examination of the S70 pages of testimony, along with the numerous exhibits, we must and do conclude that the defendants have not established by convincing proof that the fire in question was of incendiary origin and was caused by plaintiff. The evidence adduced, in other words, is not of such import that it will sustain no other reasonable hypothesis but that the plaintiff is responsible for the fire.
 

 In fortification of our conclusion we should like to make several observations respecting the testimony of plaintiff during the trial and his actions at the time of and subsequent- to the unfortunate occurrence.
 

 Plaintiff’s testimony appears to us to have been straightforwardly given and to be lacking in contradictions and evasiveness, although he was vigorously cross examined. He testified that during the night of, but preceding, the fire he returned home about ten o’clock from a meeting of the National Guard of which he was a member; that he talked with his mother for a few minutes and then went to bed in his own room, with Nathan sleeping beside him; that later he was awakened by the noise outside and thought perhaps it was someone coming to tell him of illness in the family; that he went out of his room and found the house filled with smoke; and that, thereupon, he rushed back, grabbed his brother, and ran out the front door. His description as to what he did immediately thereafter is largely the same as that furnished by Cenci and Kaufman.
 

 Incidentally, the testimony of the last mentioned two witnesses convinces us that plaintiff made every effort possible to remove his mother from the burning house, even after Cenci was compelled to leave it because of the dense smoke in the bedroom, and that it was principally through his perseverance that she was taken outside before "fire consumed the entire premises. Again, the testimony of the several law enforcement officers (witnesses for the defendants) establishes conclusively that plaintiff cooperated in every way with the investigations which followed the tragedy.
 
 *687
 
 He willingly answered all
 
 questions
 
 propounded to him; he accompanied the officers to examine his brother Nathan; and he voluntarily submitted to a lie detector test' — one which significantly resulted in his release from custody.
 

 Accordingly, plaintiff is entitled to recover from each of the insurers in the instant causes the sum of $5,000 (the amount of each policy) less $1,946.84 (paid by it to the mortgagee), or $3,053.16. Of course, he cannot be awarded the demanded statutory damages and attorneys’ fees, for it is obvious that the defendants did not act arbitrarily and capriciously in contesting the claims.
 

 For the reasons assigned the judgments of the district court are reversed and annulled, and there is now judgment in favor of the plaintiff Jerry Don Wells and against the defendant Twin City Fire Insurance Company for the sum of $3,053.16, together with 5% per annum interest thereon from date of judicial demand until paid. There is further judgment in favor of plaintiff Jerry Don Wells and against the defendant Agricultural Insurance Company for the sum of $3,053.16, together with 5% per annum interest thereon from dáte of judicial demand until paid. Except as herein otherwise provided for the respective reconventional demands of the defendants are rejected. The named defendants shall pay all costs of both
 
 courts.