265 So.2d 307 (1972)
Harold TUDURY et al.
v.
COOPERATIVE CAB CO., Inc., et al.
Harry BALDO
v.
COOPERATIVE CAB COMPANY, Inc., et al.
Nos. 4877, 4878.
Court of Appeal of Louisiana, Fourth Circuit.
June 20, 1972.
*308 Norman Mopsik, New Orleans, for Harry Baldo, plaintiff-appellee.
Ronald S. Ruiz, New Orleans, for Harold Tudury and Mildred Tudury, plaintiffs-appellees.
Dudley A. Philips, Jr., New Orleans, for R. B. Alfonso, Cooperative Cab Company, Inc., and St. Louis Fire and Marine Ins. Co., defendants-appellants.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Raymond J. Salassi, Jr., New Orleans, for the City of New Orleans, by and through the Public Belt Railroad Comm.
Before LEMMON, GULOTTA, and BOUTALL, JJ.
GULOTTA, Judge.
Two separate suits, subsequently consolidated, were brought for damages and injuries received as a result of an accident occurring on November 18, 1967, at approximately 6:00 a. m. involving a United Cab and a train operated by the New Orleans Public Belt Railroad. An action was *309 brought by Harold Tudury, driver of the cab, and his wife, a nonpaying guest passenger; and a separate action was brought by Harry Baldo, also a nonpaying guest passenger.
In the Tudury suit, the trial court dismissed the claim of Harold Tudury, but awarded him $414.50 as medical expenses for his wife. The court further rendered judgment awarding to his wife $2,600.00, casting defendants, R. B. Alfonso, the alleged owner of the cab; Cooperative Cab Company; and St. Louis Fire and Marine Insurance Company, Inc., the alleged insurer of the cab, in solido, while dismissing the action against the defendants, Public Belt Railroad and the City of New Orleans.
In the Baldo suit, the court awarded a judgment in favor of Harry Baldo in the sum of $2,965.86 and against the same defendants, Alfonso, Cooperative Cab, and St. Louis Fire and Marine Insurance, and, in addition, against Harold Tudury, in solido, dismissing the action against the City of New Orleans, and the Railroad.
Third-party demands were filed by the Public Belt Railroad against Tudury and St. Louis Fire and Marine Insurance Company for contribution and/or indemnity in the event it was cast in judgment. These were also dismissed by the trial court.
All parties to the litigation appealed except the City of New Orleans in its corporate capacity.
The facts are that the cab came to rest on train tracks crossing the 4400 block of North Claiborne Avenue in the City of New Orleans at approximately the intersection of Kentucky Street. It is plaintiffs' contention that the cab stalled as it rounded the corner of Kentucky and Claiborne then coasted approximately 25 feet onto the railroad track. Their version is that Harold Tudury tried, several times, to start to motor (according to Tudury, for a minute or two) while the cab was stalled, unaware of the approach of the train or that they were even positioned on the railroad track until Baldo attracted by the sound of the bell, saw the approaching train and gave warning to the others. At this time, according to Baldo, the train engine was about a car's length from the cab. Plaintiffs attempted to show that they did not get out of the cab after it had stalled and before the approach of the train because of their unawareness that they were stalled on railroad tracks or even that there were tracks crossing Claiborne at that location. However, plaintiffs' familiarity with the area makes this position untenable.
The evidence reflects that the Wagon Wheel Bar (now the Green Door Bar) is located at the corner of Kentucky and North Claiborne and that both Mr. and Mrs. Tudury had been employed there in excess of one year. Mrs. Tudury acknowledge that she knew of the existence of the railroad tracks. Furthermore, Harry Baldo testified that he frequented the same bar and was familiar with the area. Moreover, he must have felt the tracks upon rolling over them, and furthermore, lights from the Claiborne overpass, as well as the cab's headlights would have revealed the tracks to a driver watching the road. The approaching tracks were visible along a vacant lot near the bar and adjacent to Poland Avenue. We simply cannot believe Tudury was unaware of the presence of the railroad tracks in this area and was also unaware of the possibility that a train could be passing. The mere sight of a track should provoke anticipation of an oncoming train. Obviously, Tudury did not look; otherwise, he and the other occupants would have seen the train and attempted to quickly vacate the cab, which they admittedly did not do.
On the other hand, the testimony of the switchman, two switch foremen, engineer, and fireman aboard the train at the time of the accident was consistent and convincing. The train was traveling between three and five miles per hour as it approached the crossing. Red lights on the *310 engine, two in the front and two in the rear, were blinking in conjunction with a bell which continually rings as the lights blink. Each testified that the horn or whistle was sounded prior to impact. The testimony of Earl Leigast, the engineer, was that simultaneously upon seeing the headlights of the cab in front of the engine, the fireman warned him to stop, whereupon he immediately applied the emergency brake. At this time, the engine was approaching the curbing of the street. E. R. Luquet, the fireman, indicated that he first saw the headlights about ten feet away and then saw the cab itself, at which time the train went into an emergency stop. According to Wilfred Claret, an engineer, the train traveled another two feet three feet after the emergency brake was applied.
An analysis of the testimony convinces us that Tudury's actions are not only questionable but were in direct violation of the general ordinances of the City of New Orleans which are as follows:
Section 38-239(a) reads:
"No person shall stop, stand or park a vehicle or other conveyance, except when necessary to avoid conflict with other traffic or in compliance with the law or directions of a police officer or traffic-control device, at any of the following places:
* * * * * *
"(8) within fifty feet of the nearest rail of a railroad crossing or upon any steeet within five feet of the nearest rail of any railroad spur or service track."
Section 53-36 further provides:
"No person shall bring any automobile. . . to a stop at any place upon any track of any steam railroad in the city or within ten feet of the nearest rail of any steam railroad crossing in the city."
Plaintiffs attempt to have the doctrine of last clear chance invoked. However, it is essential for a litigant, who seeks to avail himself of this principle, to show that the party against whom it is invoked could have avoided the accident with the exercise of reasonable care. See: Scott v. Glazer, 164 So.2d 185 (La.App.4th Cir. 1964); Pennino v. Ebeling, 255 So.2d 480 (La.App.4th Cir. 1971). We are convinced that upon seeing the cab, the engineer and fireman exercised all reasonable means of avoiding a collision and were yet unable to do so. Accordingly, we are of the opinion the train did not have the last clear chance to avoid the accident.
The testimony is contradictory as to whether any warning sign or railroad sign was posted at the railroad crossing. Assuming, arguendo, the absence of the same, this fact alone in this instance was not the direct and proximate cause of the accident. As we pointed out hereinbefore, Tudury was aware of the presence of the tracks and was familiar with the surroundings. We are, therefore, of the opinion that the negligence of Harold Tudury alone was the proximate cause of the accident and resulting damage and injuries. Accordingly, we find no error in the dismissal by the trial judge of the actions against the City of New Orleans and the New Orleans Public Belt Railroad.
We now turn to the question of quantum, also raised by the appeal. Dr. George Smith was the treating physician for Mrs. Mildred Tudury. She suffered from tenderness over the right chest and neck, a small cut on the lip, bruises, fractured ribs and pain in the right shoulder. According to Dr. Smith, Mrs. Tudury was disabled for 13 weeks. Mrs. Tudury testified that she received a weekly income as a barmaid of approximately $60.00 including gratuities.
Dr. William Fisher treated Harry Baldo for the injuries he sustained. Essentially, Baldo was treated for a moderate sprain of the neck and lower back as a result of the accident. Dr. Fisher recommended conservative medical treatment, a cervical collar, and follow-up psysiotherapy. Dr. Fisher *311 saw Baldo 24 times and discharged him on February 5, 1968, less than three months after the accident, submitting a total bill for $249.00. Baldo worked on an hourly pay scale which fluctuated, depending on whether he worked weekends. He worked off and on for Eagle Asbestos for several years prior to the accident. Baldo's W-2 form for the year 1967 showed his gross wages to be $3,534.00.
Considering all of the evidence offered, the trial judge's awards in the sum of $2,600.00 to Mrs. Tudury and the sum of $2,965.86 in favor of Baldo are neither inadequate nor excessive.
While a determination of the factual issue might be dispositive of the matter under ordinary circumstances, we are confronted with a question of the relationship of the parties one to the other among Tudury, Alfonso, Cooperative Cab, and the insurance company.
We fail to find, from our examination of the pleadings and record, any evidence of this relationship connecting Tudury to Alfonso and Alfonso to Cooperative Cab Company. We can only glean from the record that some relationship or connection may have existed; however, definitive proof was lacking. Paragraph VIII of both petitions reads as follows:
"Prior to the time of the collision, defendant Alfonso entered into an agreement with defendant Cooperative Cab Co., Inc., whereby the latter would carry liability insurance on defendant Alfonso's cab. Pursuant to this agreement, defendant Cooperative Cab Co., Inc., entered into an insurance contract with defendant St. Louis Fire and Marine Insurance Co. for liability insurance. This policy was in full force and effect at the time of this collision."
These allegations were admitted to by the defendants Tudury, Alfonso, Cooperative and its insurer in their answer.
Further, the implication of Harold Tudury's testimony was that he did not personally own the cab. In reference to his claim that the cab had stalled on him he stated:
"Well, I had contacted the owner of the cab and explained to him it done it several times, he told me to have it checked when I was gassing up and everything, the mechanic, he checks it, he said it would be all right. I was inside paying the rental on my cab when he checked it. * * * (emphasis ours)
Wilfred Claret, engineer for the New Orleans Public Belt Railroad, had worked for United Cab Company prior to the accident. His testimony shed some light on the role of Sam Alfonso with respect to the cab company and drivers. He testified in this regard:
* * * * * *
"Q. When you wrre (sic) working part-time for United Cab Company did you own your own cab?
"A. No, sir.
"Q. Did you rent a cab?
"A. Yes, Sir.
"Q. From whom did you rent a cab?

"A. Mr. Sam Alfonso.

"Q. Do you know Mr. Tudury at all?
"A. No, I don't believe I do.
"Q. Did you know him then?
"A. No, Sir, I had spoken to the man, he said he worked for the same man that I did.
"Q. Your relationships were very informal with Mr. Tudury?
"A. That's right, I never knew Mr. Tudury at all." * * *
(emphasis ours)
Other than the instances we have cited, there is nothing in the record which might supply the proof required. It is paramount *312 for a determination of whether the named defendants are liable, that the relationship between the parties be established, if any relationship, in fact, existed. Therefore, it is necessary that this matter be remanded for the purpose of obtaining testimony in regard to the relationship one to the other among Tudury, Alfonso, Cooperative and the insurance company.
We have considered that the remand additionally include evidence on whether nonpaying guest passengers are included or excluded under the insurance agreement entered into between Cooperative Cab and St. Louis Fire and Marine, which agreement allegedly covers the cab in question. Cooperative and St. Louis argue that since Mildred Tudury and Harry Baldo were nonpaying guest passengers, they were excluded from the terms of the policy coverage. However, after having admitted the existence of the policy coverage, it was incumbent upon the insurer to plead the exclusion as an affirmative defense. LSA-C.C.P. art. 1005.[1] Williams v. Fisher, 79 So.2d 127 (La.App.1st Cir. 1955).
From a consideration of the statutory and case law, we deem reliance upon an exclusion in an insurance contract to be an affirmative defense.
In the absence of such pleading, no proof can be offered in connection with the exclusion. A remand to afford an opportunity for proof to be submitted in this connection, therefore, would be to no avail.
We are cognizant that defendants Alfonso and Cooperative as well as the insurer seek to have the matter reversed rather than remanded contending that plaintiffs' failure at the trial to produce this evidence is fatal to their claim. However, we are of the opinion that all parties involved erroneously were of the impression that the record was not lacking in these respects, particularly in view of the admission in the answer. Moreover, in view of the posture of this matter, as the record is constituted, we are of the opinion the ends of justice would be better served by a remand in part.
Accordingly, the judgments of the trial court insofar as the dismissal of the actions against the City of New Orleans and the Public Belt Railroad are affirmed. That part of the judgment in the Baldo suit holding Tudury liable is affirmed. The judgments of the trial court as they relate to the liability of Alfonso, Cooperative Cab and St. Louis Fire and Marine Insurance Co. are set aside, and the matter is remanded for the purposes set out above consistent with the views hereinabove expressed.
Affirmed in part; set aside in part; and remanded.
NOTES
[1] LSA-C.C.P. art. 1005 reads:

"The answer shall set forth affirmatively arbitration and award, assumption or risk, contributory negligence, discharge in bankruptcy, division, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, transaction or compromise, and any other matter constituting an affirmative defense. If a party has mistakenly designated an affirmative defense as an incidental demand, or an incidental demand as an affirmative defense, and if justice so requires, the court, on such terms as it may prescribe, shall treat the pleading as if there had been a proper designation."
See: Pizzolato v. Liverpool & London & Globe Ins. Co., 207 La. 101, 20 So.2d 551 (1944); Di Martino v. Continental Ins. Co. of New York, 187 La. 855, 175 So. 598 (1937) where in actions on fire insurance policies, incendiarism was an affirmative defense and the burden to establish it was on the insurer.
In Fontenot v. Lloyds Casualty Insurer, 31 So.2d 290 (La.App. 1st Cir. 1947) the insurer admitted issuance of a collision policy on plaintiff's automobile and failed to deny that the document annexed to the petition formed the basis for liability.