126 So.2d 718 (1961)
Crawford W. BENNETT, et al., Plaintiff and Appellee,
v.
NIAGARA FIRE INSURANCE COMPANY, Defendant and Appellant.
No. 17.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1961.
Rehearing Denied February 21, 1961.
Certiorari Denied April 7, 1961.
Bienvenu & Culver, by P. A. Bienvenu, New Orleans, for defendant-appellant.
Joe J. Tritico, Lake Charles, for plaintiff-appellee.
Before FRUGE, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
Plaintiff, Crawford W. Bennett, filed this suit to recover the face amount of three policies of fire insurance issued by the defendant, totaling the sum of $17,500, alleging that the dwelling and its contents, covered by the policies, were totally destroyed. Plaintiff also prayed for penalties and attorneys' fees. As a result of an exception of non-joinder filed by defendant, the petition was amended to include Mrs. Gladys Bennett, wife of the said Crawford W. Bennett as a party plaintiff, because *719 she was named as an insured in one of the policies. Mutual Life Insurance Company of New York was also named as an additional party plaintiff because it held a mortgage on the land and improvements and was named as payee in a standard mortagage clause attached to one of the policies.
The defendant admitted the existence of the policies but denied liability to the plaintiffs, Crawford W. Bennett and his wife, Gladys Bennett, alleging that they fraudulently set fire to the insured property. In the alternative, defendant alleged that the damage caused by the fire to the building did not exceed the sum of $3,410.32 which amount defendant offered to pay Mutual Life Insurance Company of New York.
On the request of plaintiffs, the case was tried before a jury and consumed ten days beginning March 31, 1958. By a vote of nine to three the jury brought in a verdict in favor of the plaintiffs allowing $7,000 for damage to the building and $3,000 for damage to its contents. In order to apportion the jury's award of $10,000 among the plaintiffs in accordance with their respective interests the trial judge signed a judgment in favor of plaintiffs, Crawford W. Bennett, and Mutual Life Insurance Company of New York for the sum of $5,670.58 with legal interest on the sum of $2,260.26 thereof from the date of judicial demand until paid and in favor of the plaintiffs, Crawford W. Bennett and Mrs. Gladys Bennett for the sum of $4,329.42 with legal interest from date of judicial demand until paid. No motion for a rehearing or for a new trial was filed.
From the above described judgment defendant has brought this appeal. Plaintiffs have answered the appeal praying for an increase in the amount of the award.
The issues presented to this court for determination are primarily factual. However, before we discuss the facts, we deem it appropriate to set forth the law from the case of Wells v. Twin-City Fire Insurance Company, 1960, 239 La. 662, 119 So.2d 501, 502, which is the most recent expression of our Supreme Court regarding the proof necessary to establish an insurer's defense of arson:
"`Plaintiff and the defendants agree, as is shown by the briefs of their respective counsel that the law governing cases of this nature is correctly enunciated in Sumrall vs. Providence Washington Insurance Company, 221 La. 633, 60 So.2d 68, 69 as follows: `Inasmuch as the defense is arson, the burden rested upon the insurer to establish, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in these instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire. (Here numerous cases are cited.) Accordingly, the questions presented in matters of this sort are answered by the particular facts of the controversy. * * *'
"Applicable here also are the following observations contained in Barbari v. Firemen's Insurance Company, La. App., 107 So.2d 480, 485 (a case decided by the Court of Appeal of the First Circuit and in which a writ of review, applied for by the defendant insurance companies, was denied by this court), to-wit: `It would appear that mere suspicion is not sufficient to show that a fire was of incendiary origin, the facts from which inference or presumption are drawn, must be established in evidence and the inference or presumption to which these proven facts give rise, must be strong and almost inevitable. They must be weighty, precise and consistent.'
*720 "Accordingly, we must examine the facts of the instant case and determine whether they establish convincingly (1) that the fire was of incendiary origin and, if so, (2) that the plaintiff was responsible for it."
In the Wells case our Supreme Court reversed the judgment of the lower court and held that the evidence was insufficient to establish either that the fire was of incendiary origin or that the plaintiff was responsible for it. In the present case, as in the Wells case, the evidence is entirely circumstantial on both the issue of incendiary origin and the issue of plaintiff's responsibility for the fire. Under the above quoted authorities we must therefore, in addressing ourselves to these two factual issues, determine whether or not the circumstantial evidence is of such import that it will sustain no other reasonable hypothesis but that the fire was of incendiary origin and the plaintiffs were responsible for it.
We have very little difficulty in finding that the evidence was sufficient to establish that the fire was of incendiary origin. The record shows that the dwelling was a five room frame building located in the City of Lake Charles, Louisiana. The fire was discovered at approximately 2:15 a. m. on the morning of May 25, 1957 by Mr. Thomas Petty, a neighbor of the plaintiffs, while driving past the dwelling toward his home. Mr. Petty testified that he first saw a small flame on the inside of the right front room (the southwest side of the house) and that in the next second the whole house seemed to flare up for just a moment and after that he didn't see any fire except the same small flame in the front room. Mr. Petty went to his home nearby and called the fire department.
Captain Elmer Peshoff of the Lake Charles Fire Department was in the first fire truck to arrive. Captain Peshoff testified that when they drove the truck in, the principal fire appeared to be in the front room and they immediately put a hose through the front window and extinguished the fire there. Next they went around the house looking for other flames and located a fire in the rear room on the south side. The fire was burning near the floor immediately under the window where they were unable to extinguish it with the water hose and they therefore went back and entered the house through the front door. Captain Peshoff testified that as they went through the kitchen toward the rear he smelled kerosene. They went on to the back room where they extinguished the fire there under the window. The mattresses and bed clothes in the rear room were smouldering and they threw them out. Captain Peshoff testified that the window fan in the combination living and dining room was plugged in and the window was open.
Having smelled an odor of kerosene, Captain Peshoff called District Fire Chief Cleighton Nope who came immediately to the fire. District Chief Nope testified that he also smelled the odor of kerosene all over the house and that he found two throw rugs which had a strong odor of kerosene so he called Chief Gus Stitzlein of the Lake Charles Fire Department. Chief Stitzlein testified that he arrived at the scene shortly thereafter and that he entered the dwelling and smelled kerosene. The Chief testified that there appeared to be several places in which the fire had originated and he opined that due to the kerosene fumes the fire had flashed from the front bedroom into the living room and dining room burning the wallpaper and other inflammables but not burning the wood.
Chief Stitzlein procured the services of Mr. Garland Barras, the Base Fire Chief at the Lake Charles Air Force Base, who qualified during the trial of this case as an expert on the cause and origin of fire. Chief Stitzlein and Mr. Barras went to the dwelling and conducted an investigation there within the next day or two after the fire. Mr. Barras testified that in his opinion the fire had originated in seven different *721 and unconnected places in the house as follows:
1. At the baseboard in the middle room.
2. On the floor below the window in the rear bedroom.
3. In the linen closet of the bathroom.
4. In the closet on the floor in the front bedroom.
5. In the closet in the middle room or office.
6. Near the baseboard in the combination living room-dining room.
7. Near the baseboard in the middle room or office behind the filing cabinet.
Chief Stitzlein and his secretary, Joe Shreve, who were also present during this investigation, testified that they saw these seven different and unconnected places of origin of fire. Pictures filed in evidence showing five of these places clearly demonstrate that fire burned sufficient to char the wood in each one of these relatively small areas.
In addition to the overwhelming evidence that there were seven distinct, unconnected and different places of origin of fire there is positive evidence that kerosene was used. Captain Peshoff testified that he smelled kerosene all over the house when he first entered it. District Fire Chief Nope testified to the same effect. Fire Chief Stitzlein testified that he smelled kerosene and found the two rugs which had a very strong odor of kerosene. On Saturday morning when Chief Stitzlein and Mr. Barras went back to the dwelling they found a bundle of rags or clothing in the closet in the middle room which also had a strong odor of kerosene. Deputy State Fire Marshal Lloyd Pitts who was called by the Lake Charles Fire Department to conduct an investigation testified that when he went to the dwelling on May 27, 1957 he also smelled the kerosene and he took the two throw rugs and the bundle of clothing and carried them to the crime laboratory in Baton Rouge for chemical analysis. Mr. Joseph Kock, Jr., a qualified chemist of the said criminal laboratory, testified that his analysis showed kerosene in both the throw rugs and the bundle of rags or clothing.
Both Mr. and Mrs. Bennett testified that they did not keep any kerosene or gasoline on the premises. The circumstances set forth above concerning the presence of kerosene, seven different and distinct origins of fire and the way in which these fires burned and were extinguished permit of no other reasonable hypothesis but that the fires were of incendiary origin. The only other hypothesis even suggested by the plaintiff is defective wiring but there is absolutely no evidence to support such a hypothesis and it does not appear even remotely reasonable under the circumstances of this case.
Having found that the fire was of incendiary origin the next issue is whether the plaintiffs, Mr. and Mrs. Bennett, were responsible for it. The defendant has presented a detailed and persuasive set of circumstances in an effort to show that there is no other reasonable hypothesis but that plaintiffs were responsible for the fire. Defendant's case begins with the evidence that both Mr. and Mrs. Bennett were convicted of several serious crimes during their early years. Mr. Bennett's criminal record shows that he had a conviction for burglary in 1931 for which he was sentenced to the Kansas State Reformatory for not more than ten years and served 27 months, a conviction for car theft in 1936 for which he was sentenced to two years in the Missouri State Penitentiary, a conviction for forgery in 1937 for which he was sentenced to serve two years and a conviction for violation of the Dyer Act in 1939 for which he was sentenced to serve three years in the Federal Penitentiary at Leavenworth, Kansas. Bennett met his present wife while they were *722 both incarcerated in the county jail in Carthage, Missouri. Mrs. Bennett served a term of twelve months in the Missouri County Jail for women.
Mr. and Mrs. Bennett were married in 1943 and moved to Lake Charles shortly thereafter. The record shows that neither one has any criminal record since that time. In Lake Charles Mr. and Mrs. Bennett started the Gulf States Sanitation Service in which business they were moderately successful. They had a child, bought a home, acquired trucks, tools and equipment, had good credit and apparently lived stable lives operating this business.
While in the penitentiary at Leavenworth, Kansas in 1943 Mr. Bennett met Joe Lieborwitz. When they were released from Leavenworth, Lieborwitz went to live with the Bennetts and was in fact paroled to Mr. Bennett. Lieborwitz lived with the Bennetts in Lake Charles and worked for Mr. Bennett in his sanitation business. However, Lieborwitz, even though paroled, was subsequently convicted of other crimes for various reasons and was in the penitentiary in Missouri as late as 1956. Joe Lieborwitz continued to live with the Bennetts at various times and was living there until three days before the fire.
In about 1955 the City of Lake Charles passed a large bond issue for the purpose of establishing sewerage and this had a very serious adverse effect on the plaintiff's sanitation business. In 1956 plaintiffs attempted to go into the trucking business but Mr. Bennett admits this was a failure. Their 1956 Federal Income Tax return shows they had a net loss of $119. It was apparently during the year 1956 that Mr. Bennett started trading horses from which they realized very meager earnings. Finally, on May 15, 1957 the Bennetts sold the Gulf States Sanitation Service for $7,000 of which $2,000 was paid in cash and the balance of $5,000 was payable in installments of $100 per month. Plaintiffs took the $2,000 cash which they realized from this sale and applied it as earnest money on the purchase of a farm in Cove, Arkansas, it being their intention to move to the farm. The price of the farm was $12,000 of which $2,000 in earnest money was to be applied against the purchase price if the sale was consummated, $4,000 was to be paid within six months from the date of the contract which was May 18, 1957 and the balance of $6,000 was to be paid $500 per year.
In order to pay the additional $4,000 which was due in six months from May 18, 1957 under their agreement to purchase the farm in Arkansas, the plaintiffs were relying on the proceeds from the sale of their home in Lake Charles. This house and lot had been purchased by them in 1953 for the sum of $9,200. A short while later they purchased the adjacent lot for $500. They made certain improvements to the property. On May 10, 1957 they listed the land and improvements with a Lake Charles realtor for sale at a price of $11,500. The realtor, Mr. Paul Guillory, testified that he actually appraised the lot at $4,000 and the improvements at $7,000 but he opined you couldn't duplicate the house for $7,500. Mr. Guillory testified further that a few days thereafter he had a verbal offer to purchase the property for $10,000 but that Mrs. Bennett refused. The evidence shows that the only indebtedness against this property was the mortgage to Mutual Life Insurance Company on which the balance was the sum of $5,670.58.
As a further part of their evidence defendants showed that on May 20, 1957 Mr. Bennett borrowed $500 from the First National Bank and during the same month he borrowed $300 from the Southwest Louisiana Finance Company. In addition, plaintiff owed chattel mortgages on his trucks and automobiles. He owed approximately $1,207.50 on a 1950 International truck, he owed approximately $3,784.50 on a 1954 White 4½ ton truck and he owed $2,366.45 on a 1956 Chevrolet.
The monthly notes on these various indebtednesses totaled $667.84 and the total *723 principal indebtedness was approximately the sum of $15,665.50.
It is the contention of the defendant that the dire financial condition of the plaintiffs, indicated by the above circumstances, motivated them to burn their house and contents in order to obtain the insurance proceeds.
Plaintiffs on the other hand introduced considerable evidence to show that although they were having financial difficulty, they were still solvent, the payments of all their various indebtednesses were current, no judgments had been rendered against them, none of their property had been seized and they still enjoyed sufficient credit in Lake Charles to be able to borrow, even during the month of May, 1957, the total amount of $800 without security. Plaintiffs filed in evidence a statement of assets totaling approximately $36,000 and although the defendant has properly questioned several of the items listed thereon particularly the total sum of approximately $8,000 which is shown on the list of assets as the equity in the various trucks and automobiles owned by plaintiffs, this being simply the total amount which plaintiffs had paid on the mortgages on these various vehicles, still a fair appraisal of the evidence indicates that their total assets exceeded their indebtedness by several thousand dollars.
As a further circumstance to prove that plaintiffs were responsible for the fire, defendants point out that on May 20, 1957, which was just five days before the fire, the plaintiffs increased the insurance on the building from $8,000 to $10,000 and the insurance on the contents from $5,000 to $7,500. This circumstance is explained by the plaintiffs who have shown that after selling their sanitation business and deciding to move to Arkansas they had a conference with Mr. Jack Duke, of Boling and Roberts Insurance Agency, for the purpose of cancelling the insurance which they no longer needed in connection with the business. During the course of this conference Mr. Duke advised plaintiffs to increase the insurance on their dwelling and contents which they did. Mr. Duke testified on the trial of this case that he felt these increases were justified and needed.
The defendant also introduced evidence to show that in April of 1955 Mr. Bennett bought a boat which was destroyed by fire in June of 1956. The boat was insured for $5,000 with the defendant in the present case, Niagara Fire Insurance Company, who paid the mortgagee approximately $1,500 and the balance to the plaintiff. The defendant called as a witness, Robert Carter, who testified that he had known Mr. Bennett for some time and had gon fishing with him on his boat and during the Spring of 1956, while Carter was living in Jackson, Mississippi, Mr. Bennett went to see him and offered him $100 to help him destroy the boat. However, Mr. Carter, during his testimony, stated that he did not think Mr. Bennett meant what he said and thought he was actually joking. In explanation of the burning of the boat, Mr. Bennett testified that one morning while he was operating the boat in Contraband Bayou in the City of Lake Charles a fire started at the ignition switch and he had to jump in and swim to shore.
The next circumstance to which defendant has directed our attention is that the plaintiffs and Joe Lieborwitz had all left the dwelling just before the fire, taking with them many of their possessions. The evidence shows that Joe Lieborwitz left in his truck on Wednesday, May 22, 1957 for the avowed purpose of going to Texas to seek employment. On Thursday, May 23, Mr. Bennett left in one of his trucks taking a few of his tools and other belonging and went to Holiday Courts in Mena, Arkansas which is only about ten miles distant from the farm of which plaintiffs anticipated obtaining possession within a short time. Mrs. Bennett testified that she remained in Lake Charles until Friday, May 24 in order for her young daughter to finish the school year. She had packed a certain amount of clothing, cooking utensils and important *724 papers, including their insurance policies and marriage license and motor vehicle certificates, and on Friday afternoon at approximately 2:30 p. m. she left the dwelling, picked up her little girl at school and proceeded directly to join her husband at the Holiday Courts in Mena, Arkansas. She drove the approximately 380 miles to Mena, Arkansas, arriving there at about 11:30 p. m. on May 24. At about 2:30 a. m. on the morning of Saturday, May 25, 1957 defendants were awakened by a telephone call from Mrs. Babineaux, their next door neighbor in Lake Charles, advising that their house was on fire. Mrs. Bennett explained that in anticipation of a visit by her aunt and uncle she had left with Mrs. Babineaux the name and phone number of the motel at which she would be staying in Mena, Arkansas.
Mr. and Mrs. Bennett waited until the morning of Saturday, May 25 and phoned their insurance agent, Mr. Jack Duke, seeking advice as to what they should do. That same morning at approximately 8:00, Joe Lieborwitz joined Mr. and Mrs. Bennett at the home of Mr. and Mrs. McPeak in Mena, Arkansas, where the Bennetts had gone for early morning breakfast. The Bennetts testified that they were not expecting Lieborwitz but were glad to see him.
The defendants argue that the above circumstances indicate a deliberate plan on the part of Mr. and Mrs. Bennett and Joe Lieborwitz to leave the City of Lake Charles and establish an alibi for their presence at the time of the fire. Certainly they have been successful in establishing an alibi because their whereabouts as above described were established by their own testimony and corroborated by Mr. and Mrs. McPeak, Mrs. Babineaux and Mr. Jack Duke. There is no evidence that either Mr. or Mrs. Bennett or Joe Lieborwitz were in Lake Charles at the time of the fire.
In addition to the above mentioned explanations which plaintiffs made of the various suspicious circumstances urged by defendant, the plaintiffs particularly call our attention to the fact that practically all of their furniture, furnishings and personal belongings as well as a deep freeze full of food and other contents of the dwelling, valued by the plaintiffs at approximately $7,300 certainly would not have been left in the dwelling if they had intended to destroy it by fire. Plaintiffs testified that it was their intention to obtain possession of the farm in Arkansas and then return to Lake Charles to move their furniture and other personal belongings to the farm. Plaintiffs' argument in this respect is certainly persuasive. They call our attention to the long list of furniture, furnishings and appliances, all of which were purchased new in 1953 after plaintiffs' previous home had been damaged by a flood, as well as to other items such as their little 13-year old daughter's first communion dress, her rosary, prayer book, pictures of the child from infancy, their clothing, including the little girl's slips and silk dresses, their family pictures, the 20 foot deep freeze full of food valued at $100 and other items of sentimental value which plaintiffs argue would not have been left in the dwelling to be consumed by fire.
Additionally, the plaintiffs contend there is sufficient evidence to support a reasonable hypothesis that burglars attempted to break into the combination file cabinet and safe in the dwelling and that these burglars then set fire to the house. At some time after the fire it was discovered by Mr. Bennett that the safe located in this metal file cabinet in the middle bedroom, also used as an office, had been pried open but from Mr. Bennett's testimony it is apparent that, at the time, he thought it had been pried open by persons investigating after the fire. Chief Stitzlein, his secretary, Joe Shreve, Mr. Burras and others who were in the dwelling after the fire were interrogated in this regard but they testified that they were primarily looking for fire damage and did not notice whether the safe appeared to have been pried open with a crowbar as if it had been done by burglars.
*725 In conclusion it is our impression of the evidence that there certainly were suspicious circumstances indicating plaintiffs were responsible for the fire. However, we are unable to find that the jury was manifestly erroneous in holding that defendants failed to meet the legal test quoted from the Wells case above that "a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire." The jurisprudence of this state is well settled that the findings of fact by the trial judge or jury will not be disturbed unless manifestly erroneous, especially where the crediability of witnesses was a factor in reaching these findings. It is therefore our opinion that the jury was not manifestly erroneous in finding that the defendant had failed in its burden of proving arson by the plaintiffs.
In this court the defendant strenuously urges that in the event judgment is affirmed in favor of the Bennetts, the award for damages to the building should be reduced from $7,000 to $3,410.32.
Shortly after the fire the defendant had Mr. Foy Williams, a building contractor in Lake Charles, estimate the cost of repairs to the Bennett dwelling. Mr. Williams testified that he would be willing to perform these repairs for the sum of $3,410.32 according to his estimate which is filed in evidence. Plaintiffs point out that this estimate does not include an allowance for replacement of venetian blinds, which would cost approximately $200, nor does it allow anything for relacing the floors in the dwelling. The evidence shows that the floors in the kitchen and the bathroom were linoleum and the floors in the rest of the house were oak and even according to the testimony of Mr. Williams floors of oak are very likely to buckle from water damage and need replacing. On the other hand, the plaintiffs introduced the testimony of Mr. Marsden Miller, a well qualified building contractor, who estimated the fire damage at $6,485.75. The estimates prepared by Mr. Miller and filed in evidence include estimates by subcontractors on the electrical work, plumbing work and painting and are obviously more detailed and more complete and under the circumstances we, like the jury, are of the opinion that Mr. Miller's estimate should be accepted. From the record we are unable to determine exactly how the jury arrived at the figure of $7,000 for damages to the building and it is our opinion that this figure should be reduced to the amount of Mr. Millers' estimate which is the sum of $6,485.75.
Regarding the damages to the contents, plaintiffs have asked that the award be increased from $3,000 to $6,544 and defendants on the other hand urge that the amount of this award should be reduced to the sum of $1,000.
To prove the damages to the contents the plaintiffs introduced the testimony of Mr. John Huber, an independent insurance adjuster of 10 to 12 years experience. As shown by his estimate marked Exhibit P-56 for identification and filed in evidence, he estimated the replacement value of the various items as of the date of the fire at $3,851.44. However, as to the appliances such as the refrigerator, deepfreeze, sewing machine, mangle, and range, Mr. Huber testified that he was unable to determine whether or not these appliances could be repaired, and if so the cost of repairs, so he did not give any estimate as to the damages to these appliances. The evidence shows that although the enamel on the Roper range was slightly discolored the Bennetts are still using it in their dwelling to which they returned in November of 1958. Apparently the damage to the range can be repaired but we did not find in the record any evidence of the cost of these repairs so are therefore unable to allow any damages therefor. The Coldspot Refrigerator is also still being used by the Bennetts although they testified it did not freeze properly. Mr. Huber testified it was discolored. Mr. Veret, who qualified as an expert on *726 refrigeration appliances, testified it was a total loss and estimated its value on the date of the fire at $175 which figure we find is proper. As to the deepfreeze, Mr. Veret testified it also was damaged beyond repair and estimated its value at $250 which figure we accept. The cabinet of the Kenmore sewing machine was damaged but we do not find the evidence shows it was a total loss nor do we find an estimate of the cost of repairs thereto so we are unable to make an award therefor. The same is true of the mangle.
We therefore conclude that plaintiffs are entitled to recover for damages to the contents:

1. Items as shown on Mr.
 Huber's estimate identified
 as P-56 $3851.44
2. Coldspot Refrigerator 175.00
3. Deepfreeze 250.00
 _______
 Total $4276.44

Although in their answer to this appeal the plaintiffs have renewed their demand for penalties and attorneys' fees, it is obvious under the above circumstances that the defendant did not act arbitrarily and capriciously in contesting this claim. Plaintiffs demand for penalties and attorneys' fees is therefore denied.
For the reasons hereinabove set forth it is therefore our opinion that the judgment of the lower court should be amended so as to show that plaintiffs are entitled to an award of $6,485.75 for damages to the building and $4,276.44 for damages to the contents thereof or a total of $10,762.19. Accordingly, we affirm that portion of the decree ordering the defendant, Niagara Fire Insurance Company to pay to the plaintiffs, Crawford W. Bennett and Mutual Life Insurance Company of New York the sum of $5,670.58 together with legal interest on the sum of $2,250.26 thereof from the date of judicial demand until paid. The judgment of the lower court is amended so as to provide that the defendant, Niagara Fire Insurance Company pay to the plaintiffs Crawford W. Bennett and Mrs. Gladys Bennett the additional sum of $5,091.61 together with legal interest thereon from date of judicial demand until paid. Except as hereinabove amended the judgment of the lower court is affirmed. All costs of this appeal are assessed against the defendant.
Amended and affirmed.
Rehearing denied; HOOD, J., recused.