128 So.2d 284 (1961)
Odis CREEL, Plaintiff-Appellee,
v.
AUDUBON INSURANCE COMPANY, Defendant-Appellant.
No. 5186.
Court of Appeal of Louisiana, First Circuit.
March 6, 1961.
Rehearing Denied April 10, 1961.
Certiorari Denied May 12, 1961.
*285 Pittman & Matheny, Hammond, for appellant.
Woodrow W. Erwin, Franklinton, for appellee.
Before ELLIS, LOTTINGER, HERGET, JONES and LANDRY, JJ.
ELLIS, Justice.
This is an action to recover the face value ($10,000) of a fire insurance policy together with penalties and attorney's fees. The policy was issued by Audubon Insurance Company on May 15, 1959, insuring plaintiff against loss of his residence and its contents. The policy provided for $7,500 for loss of the dwelling and $2,500 for loss of contents. The house and the contents, with the exception of a few articles, were totally destroyed by fire on October 7, 1959 at about 1:40 o'clock a.m.
The insurer resists the demands, on several grounds, but principally alleges that plaintiff, either jointly or separately, by *286 himself, or through the intervention of some third person, burned or caused to be burned the insured property for the purpose of collecting the insurance.
After a trial on the merits, the lower court ruled for plaintiff for the full amount of the policy plus 25% penalties and $3,000 attorney's fees.
In a suit of this nature both plaintiff and defendant agree that the law applicable is found in three cases: Sumrall v. Providence Washington Insurance Company, 1952, 221 La. 633, 60 So.2d 68; Barbari v. Firemen's Insurance Company, La.App. 1 Cir., 1958, 107 So.2d 480; and Wells v. Twin City Fire Insurance Co., 1960, 239 La. 662, 119 So.2d 501, 502. Treating of the matter, the organ of the Supreme Court in the Wells case stated:
"Plaintiff and the defendants agree, as is shown by the briefs of their respective counsel that the law governing cases of this nature is correctly enunciated in Sumrall v. Providence Washington Insurance Company, 221 La. 633, 60 So.2d 68, 69, as follows: `Inasmuch as the defense is arson, the burden rested upon the insurer to establish, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against the plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And in these instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire. (Here numerous cases are cited.) Accordingly, the questions presented in matters of this sort are answered by the particular facts of the controversy. * * *' (Italics ours.)
"(1) Applicable here also are the following observations contained in Barbari v. Firemen's Insurance Company, 107 So.2d 480, 485, (A case decided by the Court of Appeal of the First Circuit and in which a writ of review, applied for by the defendant insurance companies, was denied by this court), to-wit; `It would appear that mere suspicion is not sufficient to show that a fire was of incendiary origin, the facts from which inference or presumption are drawn, must be established in evidence and the inference or presumption to which these proven facts give rise, must be strong and almost inevitable. They must be weighty, precise and consistent.'
"(2) Accordingly, we must examine the facts of the instant case and determine whether they establish convincingly (1) that the fire was of incendiary origin and, if so, (2) that the plaintiff was responsible for it."
Since the questions presented in matters where the defense of arson is urged are answered by the particular facts of the controversy, the following facts are pertinent.
Generally, the facts as shown by the record are that the plaintiff, Odis Creel, was employed by a road crew near St. Francisville and he usually came home on week ends. His wife, Mrs. Gladys Creel, usually stayed at their home or with her mother-in-law during his absence. On Tuesday, October 7, 1959, shortly before 1:30 a.m., Mrs. Creel was asleep at her home and was awakened by smoke which she described as "a smothering and all choked up" feeling. She got out of bed, went into her living room and could see the smoke coming from the back of the house and a "whif of fire" in the smoke. She did not remember her actions until she got to her mother-in-law's house approximately a mile and a quarter down the gravel road. When she arrived, she had on over her night clothes what she described as a "duster" which was hanging *287 over the foot of her bed. She does not remember getting this duster or putting it on. Also found on the front porch were some of her clothes, a cedar chest and a sewing machine and in the yard her purse with $30 or $40 in it. This was found by the parties who came to the fire, after she had gotten to her mother-in-law's home and the fire department in Franklinton, La., had been notified of the fire. Mrs. Creel did not remember what she did after seeing the rolling smoke and flame, but admits that she must have pulled the cedar chest to the front porch as well as the other articles described. She did not even remember getting in her automobile. It is shown that there were two phones closer than her mother-in-law's which she did not use or attempt to use. She testified that she did not remember anything from the time she was awakened until she got to her mother-in-law's. Mrs. Creel stated that her brother-in-law, Louie, called her husband on the telephone and that she spoke to him and told him the best she could what had happened, and the plaintiff inquired as to whether she needed him and she told him it was not necessary for him to come home. He stated that he would see his boss and would come as quickly as he could. On the other hand, the plaintiff testified that when he wanted to communicate with his wife he usually called her early in the morning and that on the morning of the fire he called and tried to get his wife at their home at around 6:00 or 6:30 a.m. and failing to get an answer and knowing that she usually stayed with his mother, he called there and his wife told him that the house had burned. Later that morning his brother, Louie, came to St. Francisville and told him about the fire. The plaintiff testified that he called his wife because he had sold a truck sometime previously and the purchaser had promised to pay so much per load and at that time it amounted to about $300 which he had promised to pay that day. He wanted his wife to take the $300, when the purchaser brought it, to the bank, as he owed the bank some money on this truck. Plaintiff when questioned by counsel for defendant as to why he had not immediately come home, explained that he was running a bull dozer and his absence would have caused his employer to shut down "two scrapers and a bull dozer * * * and my house was already burned, there was nothing I could do, he would have had to shut down better than a hundred thousand dollars worth of equipment for me to have just walked off; I called Mr. Stevenson and asked him if it was necessary for me to come that morning." Mr. Stevenson was the local insurance agent of the defendant with whom he had taken the policy.
When the fire department in Franklinton arrived, the house was practically burned and there was nothing that could be done. The local agent was notified who, in turn, notified the defendant company representative in New Orleans. The State Fire Marshal's office sent a representative who testified that he made a thorough inspection and investigation of the fire and that it appeared to have originated in the rear of the house, "in the bath room section, close to the hot water heater, due to the amount of charred wood found in that section." This officer explained why he was of the opinion that it had started in this section of the house. He found no evidence of arson, and, in fact, was of the opinion, and his report so states, that the fire was of accidental origin. He did not know the cause but definitely testified that he could find no evidence of any inflammable material and stated that had it been used "you can generally pick up the odor." He also testified that you can dig into the ashes and test them and find whether inflammables were used, as well as dig down into the ground and run tests to determine whether gasoline or coal oil had been used.
There are other facts which were brought out upon the trial of the case that we believe can best be discussed in answering defendant's arguments designated as Article 1, (a) through (p).

*288 (a)
The defendant argues that plaintiff's conduct in not returning home after learning of the fire when it would have been easy for him to have done so is a most suspicious circumstance and is not the natural course of conduct which an innocent owner would have followed in similar situations. We find nothing suspicious in view of the plaintiff's explanation as to why he did not return home, viz., that the home had already burned, he called his local insurance agent, who also testified in the case, and whose testimony will be later discussed, and found there was no necessity for him to return, and, in addition, it would have closed down his employer's job at a great cost. We believe that he has given good reasons which completely answer or destroy any suspicions which might be cast upon his failure to return home immediately upon learning of the fire.

(b)
The defendant argues that there is no question but that plaintiff was in extremely bad financial condition for at least a year or two prior to the fire. The record shows that plaintiff denied being in a bad financial condition. It is definitely shown that all he owed prior to the fire was $2247.75 with interest and attorney's fees as a result of a judgment which was obtained upon a note that plaintiff endorsed for his brother. He had been sued along with one W. W. Creel for $235 and had paid it off a year before the fire. Also, he had been sued by Bickham Motor Company for $383.97 which was paid in March, 1959, or some seven or eight months prior to the fire. Counsel for the defendants argued that plaintiff in his deposition taken on February 25, 1960, when asked about his financial condition stated that he was making a living and denied that anyone was pushing him or that he was overburdened with debts and admitted owing Mr. Bickham only two or three hundred dollars. In the deposition he was not asked specifically about the debts that he owed as a result of having endorsed his brother's note and did not mention it. Plaintiff readily admitted it on the trial of the case when asked about the specific debt. Mr. Bickham, owner of the Bickham Motor Company and judgment creditor against the plaintiff and his brother, was called to testify by the defendants, and under cross examination was asked whether Mr. Creel "always fairly paid his bills," and he answered, "Yes. Up to this time he has." He admitted that because of a rainy season that people in the dirt business for the last two years had had a hard time. The plaintiff owned a bull dozer; however, at the time of the fire he was operating a bull dozer for a road contractor in order to learn the dirt moving business.
Clyde J. Fussell, Executive Vice President of the Washington Bank and Trust Company, was called in rebuttal and testified that on February 27, 1958, the plaintiff owed the bank $8154 and during 1958 paid $3697 and during 1959, in eight months he paid $2754 and "the loan was paid out on November 16, 1959, amounting to $1806.50." The witness explained that the last amount was paid off by some company in Baton Rouge that picked up "our note on the repair, overhaul job on a car, a D.C.-6, some kind of bull dozer." This last payment was a re-financing of the debt with the repairs included. In addition to the above testimony, counsel for the defendant placed Chas. J. Bradley, plaintiff's employer, on the witness stand. He testified that he was a road contractor and that the plaintiff was employed by his company in October, 1959 and particularly on October 7, 1959, which was the day of the fire, and that he remembered that day because plaintiff's brother came to the job and told him his house had burned. He testified that he saw the plaintiff shortly after his brother gave him this news and he could tell that something was wrong, "that he had had some bad information, and I figured that somebody was sick or something of that kind." Plaintiff left the job but was not gone very long, which corroborates *289 the latter's statement that he called Mr. Stevenson to see if it was necessary for him to come home that day. Mr. Bradley testified that the plaintiff was a good worker, and when asked about his reputation, he stated "Perfect."
The above testimony completely fails to convince us that the plaintiff was in such a serious financial condition at the time of the fire as being sufficient to establish a motive for arson. The testimony shows that he was in a much more serious financial condition prior to that time and that he had ample insurance, although somewhat less, on his home during 1958. From the record it would appear that he was a hard working man, conscientious, and with a desire to pay the debt, which apparently was contracted to buy and repair machinery with which he hoped to make a living. The debt which he owed at the time of the fire was principally that of his brother, and it was only approximately one-fourth of what he had owed in 1958 and we do not believe it was of such a serious nature as there was no evidence that he was being pushed on this debt, to have caused him to deliberately burn his home.

(c)
It is established that prior to July 23, 1959, which was the date his present policy was secured from the defendant company, that the plaintiff had only carried $5000 coverage on the dwelling house and $2500 on the contents. On February 25, 1960, plaintiff in a deposition testified that the insurance was the "same thing" that he had before and, therefore, it was reasonable to believe that he well knew that he had increased the coverage on the house and that the statement made by him in the deposition was intentionally false and was made for the purpose of misleading the defendant, which the latter submits was another factor or circumstance that on July 23, 1959 he was contemplating the intentional destruction of the premises for the purpose of collecting from the insurance company.
On the trial of the case, while on cross examination, the plaintiff was asked if in his statement he had not told counsel for the defendant that he always had $10,000 insurance with the prior agent and he answered, "I don't remember, I told you I thought the insurance was the same." No other questions along this line were asked and we do not believe that the plaintiff deliberately intended to mislead counsel. It is also shown that at the time the deposition and statement was taken neither the plaintiff nor Stevenson, the local insurance agent, who sold the insurance to plaintiff, nor plaintiff's wife knew or had any idea or had been told that the insurance company was investigating because they believed the plaintiff or his wife was guilty of arson. Furthermore, it would be more than stupid for the plaintiff, after stating the names of the previous insurance companies, to deliberately intend to mislead counsel. We do not attribute an intentional falsehood to the plaintiff for the purpose of misleading defendant, nor as proof that the plaintiff was contemplating the intentional destruction of his home for the purpose of collecting insurance.

(d)
It was shown on the trial that on December 15, 1958 plaintiff was the owner of a truck at a place called Leander, La. in Rapides Parish which burned on that date. The matter was investigated by the State Fire Marshal's office. On this trial, Mr. LaFranc, a Deputy State Fire Marshal, who had made the investigation of the fire which destroyed the plaintiff's home, testified that one of counsel for defendant had called him on the phone the prior afternoon requesting that he bring the file marked "Odis Creel" which also contained a report of an investigation of the burning of the Creel truck, in Rapides Parish. Counsel for defendant offered this report which was objected to by counsel for plaintiff. It was shown that LaFranc knew nothing about this investigation or report and the latter was not prepared by him but *290 by another fire marshal, Clarence Johnson, who was still with the Department. The report purportedly was an original but uncertified as well as unidentified as the witness could not testify, neither having participated in the investigation nor having made the alleged original report. The Judge sustained the objection and refused a continuance. Counsel argues that if a certified copy would be admissible in evidence then surely the original itself would be admissible in evidence. An uncertified or unidentified document, whether it be an alleged copy or an original, is not admissible in evidence. The document is not certified as being a true copy of an original or as being the original and the party who prepared the document originally was not present to testify.
In any event, the testimony shows that the insurance company paid the finance company on the policy after the truck had burned, although it was investigated. There were no charges nor any suit filed. However, counsel for the defendant argues that there is no question but that the record establishes that within a period of less than one year plaintiff experienced two fires which were investigated by the State Fire Marshal's office. This is true, as shown by the record; however, the present one was investigated with the result of a finding that it was of an accidental beginning and no suggestion of arson. No stigma should attach to plaintiff merely because it was investigated. We do not know what the investigation revealed as to the truck, however, even if the Deputy Fire Marshal who made the investigation believed that the fire was of incendiary origin, it would be insufficient to bar the plaintiff's recovery in this case if the facts in this case do not prove according to the legal standards required in the law and jurisprudence that the plaintiff or his wife deliberately set their home on fire causing it to be destroyed.
As to refusal to grant a continuance or hold the case open, we cannot say that the District Judge abused his discretion.

(e)
Counsel next argued that copy of the official report of the Fire Marshal's office states that the cause of the fire was "unknown" and, therefore, it follows that the conclusion that the fire was accidental is meaningless. We cannot agree with this argument. It means that the fire was not deliberately set. We have heretofore discussed the facts upon which the report was based as contained in the testimony of the State Deputy Fire Marshal as to why he came to the conclusion that the cause of the fire was not deliberate.

(f)
Counsel for defendant next complains of the failure of the plaintiff to take the stand, as well as the failure to introduce the testimony of his wife, Mrs. Gladys Creel, nor the testimony of either of the Creel brothers who lived in the vicinity and who were allegedly at the fire soon after it started, and that such failure casts a "heavy cloud of suspicion over them", meaning the plaintiffs. Further, that failure to call them gives rise to the conclusion that the testimony would not have been favorable to the plaintiff.
In answer to this argument, the record contains the testimony of the plaintiff taken by counsel for the defendant slightly less than a month after the accident and again on February 25, 1960, and he was called on cross examination on the trial of the case. As to the wife, the investigator of the defendant company talked to her within two days after the fire, obtained a complete list of the contents of the house which totaled $3400, however, there is some doubt as to whether it was a complete and total list of all contents. Mrs. Creel says that the agent of defendant company told her when she reached that amount that it was more than the claim of $2500 and that would be all that was necessary, whereas the agent states that he told her that what she had given him amounted to more than the $2500 but that both knew it was not a complete *291 list of the contents. In addition, the wife, Mrs. Creel, was questioned by counsel for defendant on the 16th day of October, 1959 and placed on the stand as the court's witness where she submitted to cross examination by all counsel. As to the failure to place the brothers on the stand, there can be no presumption of arson. The facts in the record negative any belief that their mere presence at the fire after Mrs. Creel had gotten to her mother-in-law's would throw any light on the cause of the fire.
Counsel complains also of the court's refusal to allow Mrs. Creel to be called under cross examination and that he "should have been allowed to cross examine her". As stated, the court had Mrs. Creel sworn and allowed counsel to cross examine her at length and at will.

(g)
Counsel next argues that Mrs. Creel's failure to stop at the home of Mr. and Mrs. Willie J. Passman which, it is shown, is about a thousand feet from her residence and use the telephone rather than to travel approximately a mile to the home of her mother-in-law was a most suspicious circumstance and gave less opportunity for salvaging the property.
We believe, after reading the record, that Mrs. Creel became upset and excited and did not remember what she had done immediately after she was awakened by the smoke which was choking and smothering her. Her actions bear out this belief and her testimony to that effect. She testified that she slept with her watch on, which the writer knows not to be too unusual as he is guilty of the same thing, and that she removed a cedar chest, which is shown not to have been a very large one, to the front porch and a sewing machine which is described by the husband as being portable and by her as being a home cabinet machine, and the testimony fails to reveal the difference, to the front porch also, and some clothes that she had on a hanger and she even brought her purse to the front porch and threw it down with $30 or $40 in it into the front yard together with the hanger of clothes. Much is made of the fact that she testified she left the keys in the car. This is also not unusual in the country and with some people who live in small towns. It is also shown that a war bond burned up in the house. She was not thinking calmly and deliberately or she would not at least have thrown her purse down in the yard with $30 or $40 in it and if she had not been so upset she probably would have gone into the Passmans' home and given the alarm. It would seem, if she deliberately wished the house to burn, that she would not have gone anywhere and alarmed anybody until she was sure that it would be completely destroyed.

(h)
Counsel argues that there is no testimony that Mrs. Creel had ever experienced such a lapse of memory before or since, and that if she had suffered such a condition, she did not think it important enough to be checked by a doctor, which he contends is a most unusual occurrence, and her conduct casts serious doubt as to the truth of her testimony. From a reading of this testimony, we believe that Mrs. Creel told the truth.

(i)
Counsel under this heading argues that there are a number of unusual circumstances surrounding the fire which were not properly explained. He cites the moving of the cedar chest from the rear bedroom and the sewing machine located in Mrs. Creel's bedroom to the front porch "and saved" them; also, that Mrs. Creel's clothes were found in the front yard with her purse. He questioned Mrs. Creel's ability to move the sewing machine and cedar chest by herself. Whether the cedar chest and machine were on rollers was not shown in the testimony. Further, there is no testimony that the machine, whether a portable or a cabinet sewing machine, and the cedar chest were *292 heavy. If defendant wished to question the ability of Mrs. Creel to move these articles to the front porch, evidence should have been introduced by it. The burden of proof in this case is on the defendant to sustain a charge of arson. As far as the saving of the machine and cedar chest, this was not due to Mrs. Creel, as she left them on the porch, but to the fact that the fire had not reached the porch at the time the first spectators arrived. They are the ones that saved these articles. We have already commented on the fact that Mrs. Creel left her keys in her car and slept with her watch on. Counsel also mentioned the fact that she had no difficulty in locating her glasses. This is not unusual for one who must wear them. Counsel poses the question, "Does it not seem strange that Mrs. Creel could take care of all these details with such exactness yet not have a recollection of what was going on?" She did not take care of the details of the cedar chest and sewing machine with much exactness as they would most certainly have burned had not spectators arrived in time to save them. If, as she testified, she usually left the keys in the car, this required no thought or attention to any detail and if she left her glasses on the table by the bed and it was necessary that she wear them, that is possibly the first thing she automatically reached for without the necessity of thinking. In addition, there is no showing whatsoever that anyone else was in the Creel home except Mrs. Creel. The defendant company investigated Mr. Creel's whereabouts but offered no testimony whatsoever to dispute the fact that he was in St. Francisville and had been there since he returned to work from a week end at home. We believe, as must the District Judge, that Mrs. Creel's actions support her testimony that she became excited and described her condition as "blacking out", her mind "coming and going". They were not the actions of one who had planned to deliberately burn the house and contents. She would never have grabbed a hanger with a few clothes on it and her purse and ended up by throwing them in the yard and leaving them there.

(j)
Counsel makes much of the fact that the refrigerator and deep freeze contained no food. Counsel points out that this testimony stands unchallenged and was in no way contradictorily explained by the testimony of Mrs. Creel or any other witness. Mrs. Creel was not asked to explain it by Mr. Sasser, the agent of the company who investigated the fire and talked to Mrs. Creel the day after its occurrence, nor by counsel for the defendant when they examined her by question and answer on October 16th, or nine days after the fire, nor when they had her under cross examination on the trial of the case. If Mrs. Creel took the food out deliberately before the fire, if there was any in there to begin with, then it is the only content of the house that the record reveals was removed completely from the house other than a few clothes on a hanger and a purse of Mrs. Creel's with $30 or $40 in it.

(k)
Counsel next calls the court's attention to the fact that Mrs. Creel had advised Mr. Sasser, their representative, that Mr. Creel was working in Lake Charles and, therefore, their investigation as to his whereabouts was conducted in Lake Charles. There is nothing in the record to show that there was any investigation in Lake Charles but there was an investigation at St. Francisville and Mr. Creel came home the week end following the fire and they got a statement by question and answer from him within four weeks after the fire and could have gotten it sooner had they insisted. Mr. Stevenson, the local agent, was anxious to cooperate although he did not know that the company was considering denying the claim on the ground of arson. It is true that Mrs. Creel evidently told the State Fire Marshal's representative that he was working in Lake Charles, told Mr. Stevenson, the insurance agent, that he *293 was working in Lake Charles and that she always knew where her husband was and could contact him by telephone. There is nothing in the testimony, however, that would lead the court to believe that she intentionally was trying to deceive or hide the whereabouts of her husband. We note in the statement which counsel for defendant obtained on the 16th day of October, 1959 from Mrs. Creel that he asked her who her husband was employed "by" and her answer was, "I can't remember the man's name for love or money". Following this question and answer, counsel then asked where her husband was employed and Mrs. Creel answered "Around Alexandria, Louisiana". The record shows that her husband had worked in DeRidder, not far from Lake Charles, and also had done work with his equipment in Rapides Parish. She was asked no more questions along this line and there was no explanation sought or given as to why she testified she could always get in touch with him.

(l)
Counsel contends that Mr. Sasser, the defendant's insurance adjuster, was subjected to extensive cross examination over the objection of defendant and in this objectionable testimony he testified that a Mr. James Oakes, who is Vice President in charge of claims for defendant company and under the supervision of Mr. Sasser, had gone to St. Francisville and talked with Miss Dorothy Taylor, in whose home the plaintiff boarded while working there. Counsel for plaintiff then asked Mr. Sasser if he knew of his own knowledge whether or not Oakes had offered Miss Taylor any money to change her testimony concerning what she had told him about the whereabouts of Mr. Creel and he answered in the negative. Counsel complains of the fact that plaintiff did not call Miss Taylor nor was her absence explained in any way and that it was most unfair and improper for him to accuse Mr. Oakes of attempting to bribe a witness and then fail to establish by any evidence whatsoever such derogatory allegation and, further, that the failure to call this witness raises an assumption that if she had been called her testimony would not have been favorable to the plaintiff. We fail to see where the testimony establishes any proof of any bribery and, even if we assume that if she had testified, she would have stated that he did not try to bribe her, how it would affect or lend credence to the contention of the defendant that the plaintiff committed arson. On the other hand, we might assume in view of the fact that Mr. Oakes, on behalf of defendant company, went to St. Francisville and investigated the whereabouts of the plaintiff on the night of the fire by interviewing his landlady, then failing to call the landlady or testify himself, that such testimony would be unfavorable to the defendant. Such an assumption is unnecessary, however, as there is no testimony whatsoever that places Mr. Creel in Washington Parish on the night that his home burned.

(m)
Counsel next states that among articles saved were certain sheets located in a small building near the house. This statement is based upon the testimony of Mr. Sasser, defendant's agent and representative, who testified when he was investigating the fire, within one or two days, that he saw fifteen sheets in a small outbuilding, hanging up as if to dry. Counsel argues that it was exceptionally unusual to have that many sheets drying and particularly in view of the fact that Mrs. Creel was living alone in her home and contends that Mrs. Creel was "preparing herself for the event and that she hated to lose her nice linen and, therefore, hung them out in a safe place."
Mrs. Creel denies that she had fifteen sheets hanging in the outhouse after the fire. There is no further evidence on the subject. However, she readily admitted having some china in the outhouse but testified that this was given to her in a "shower" after the fire. She is uncontradicted in this testimony. We find nothing in the *294 record upon which we could base a positive conclusion as to whether there were fifteen sheets hanging in the outhouse or not. The burden was upon the defendant.

(n)
Counsel for defendant next complains of the refusal of the trial court to allow him to cross examine the defendant's local insurance agent in Franklinton, La., Mr. Stevenson, as to the value of the house. Mr. Stevenson had been placed on the stand by the plaintiff and they had proven by his testimony the value of the house at the time he insured it to be $8000 and the contents approximately $3000 or a total of $11,000. The witness was submitted for cross examination to defendant and counsel for the latter began to cross examine him with regard to the value which he placed on the house when an objection was made by counsel for the plaintiff based upon LSA-R.S. 22:695 known as the "Valued Policy Clause," which provides for payment by the insurer, in case of total destruction, without criminal fault on the part of the insured or the insured's assigns, the total amount for which the property is insured, at the time of such total destruction, in the policy of such insurer. Counsel for the defendant admitted to the court that the purpose was to support the defense of arson, by showing that the house was insured excessively and not for the purpose of setting forth the amount that would be due to the plaintiff, if he was entitled to recover. The District Judge refused to allow cross examination along this line, and sustained the objection. We believe that the lower court was in error in refusing to allow the cross examination for the purpose proposed, however, the witness was their local insurance agent who had written this policy and who was familiar with the home of the plaintiff and who positively testified as to a value slightly higher than the amount of the insurance. Counsel for the defendant tendered no other witness, nor did he state to the court that he desired to offer any independent testimony as to the excessive value on the house. It appears that the plaintiff opened the door unnecessarily, as the burden is upon the defendant to prove the arson and the motive therefor. The defendant does not charge as a motive any excessive insurance of the home. A cross examination of this witness would not have changed his value on the house any more than the full and lengthy cross examination changed his value of $3000 on the contents, and, therefore, the ruling is immaterial insofar as the cross examination of this witness on the value of the house is concerned.

(o)
The next contention made by the defendant is in argument as to the discrepancy in the testimony of the plaintiff and his wife as to their intention to sell the property. It is clear that Mrs. Creel wanted a larger place and possibly a dairy, whereas Mr. Creel did not want to sell the property. Mrs. Creel, apparently without her husband's knowledge, placed an advertisement in the paper approximately a month and a half prior to the trial. She did not, apparently, remember having placed the advertisement as shown by statement to the Deputy Fire Marshal, which is contained in his report, however, all facts and circumstances are to be considered in a case depending upon circumstantial evidence, and unless and until a motive for the arson is established and the circumstantial evidence relied upon to prove that the plaintiff and his wife, in this case, were responsible for the fire, and that it was of incendiary origin is of such import or of such strength that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire, inconsequential discrepancies which could easily be a lapse of memory are immaterial. The testimony is totally insufficient to prove that the fire was of an incendiary origin, in fact, the preponderance is to the contrary. Proof of motive is totally lacking. These two elements must *295 be proven before defendant would be entitled to a judgment upon its defense of arson.

(p)
Counsel next argues that the fact that the television set belonging to the plaintiff was in the shop of Mr. Burris at the time of the fire is a material circumstance, but that even more important is the testimony concerning the antenna which Mrs. Creel had talked about buying. The testimony shows that this television set was one of the oldest in their neighborhood. The testimony further shows that in the latter part of September Mrs. Creel called and asked about the price of an all channel antenna several weeks before the fire but told Mr. Burris that she didn't want it. When asked under cross examination why she didn't want it, she merely stated that she didn't have anything else to say about it "there is nothing else for me to say." Counsel argues that this is most important as it shows that after it was decided that the house would be destroyed, it made no difference whatever which television antenna burned as the old one would bring them just as much from the insurance company as the new one. There is nothing unusual in Mrs. Creel's answer that she called Mr. Burris and told him that she didn't want the antenna. It is rather far fetched to charge her with the ability, even, to think that she could get as much for the old one as she could for the new one. Such a circumstance is too flimsy to even consider.

(q)
Counsel argues that there are grave inconsistencies in the testimony as to the time and manner the plaintiff was notified of the fire and that it cast serious doubt as to the truth and veracity of the Creels and are convincing to the defendant that plaintiff was responsible for the fire when considered with other inconsistencies in the testimony.
The inconsistency complained of under this heading is as to the manner and time that the plaintiff was notified of the fire. Without going into detail we are of the opinion that it is clearly established by the testimony that the plaintiff at approximately 6:30 a.m. attempted to call his wife at their home, and failing to get her, and knowing that she spent the night at times with his mother, he called the latter home, where he talked to her. He gave his reasons for calling her. In the meantime, his brother, Louie, had already started to St. Francisville to notify him personally and the plaintiff testified that he got there around 7:00 o'clock, whereas his employer testified that the brother came over there to the job and told plaintiff his house had burned, and when questioned as to the time answered, "To the best of my recollection around ten o'clock in the morning." Therefore, there is a discrepancy as to the time the brother got there, which is immaterial. The main fact proven is that the brother did go to St. Francisville to notify him and in all probability the plaintiff is correct as to the time and the employer is not. It would appear immaterial as counsel for the defendant did not place any stress in his examination of the witnesses on the discrepancy in the time or give any inkling then or now as to the materiality of the discrepancy to the main object of the suit. We believe that the plaintiff and Mr. Bradley were both honest in their testimony as to when they thought Louie got to St. Francisville, and therefore it would not affect the credibility of the plaintiff or Mr. Bradley but would only serve to establish which had the better memory if it was pursued to a definite finding of the actual time that he did get to St. Francisville.

Argument No. 2
Counsel next contends that because of the deficiencies in the proof of loss, and the evidence introduced thereunder, in any event, there should have been no award under the contents portion of the policy.
The policy states "Requirements in case loss occurs. The insured shall give immediate written notice to this company of *296 any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in details quantities, costs, actual cash value and the amount of loss claimed; and within sixty days after the loss, unless such time is extended in writing by this company, the insured shall render to this company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof, and the amount of loss thereto * * *". (Emphasis added.) The defendant admits that two proofs of loss were signed by plaintiff and that the first was prepared by Mr. Sasser and was signed by Odis Creel and Gladys Creel but was not subscribed and sworn to before a Notary Public but was signed by Rev. Paul L. Thomas, witness, rather than a Notary Public. This first proof of loss was prepared and is entirely in the handwriting of Mr. Sasser, the company's agent and representative, except for the three signatures. In view of the fact that it was not signed before a Notary Public, another proof of loss was prepared by either Mr. Sasser, or, as he testified, another representative of the company in the office, exactly as the first proof of loss sent to Mr. Stevenson, their agent, with instructions to have it duly signed. Mr. Sasser contends that the second one was sent back with instructions also to have a list of the contents annexed to it together with the values and the loss, however, Mr. Stevenson did not understand that there were any instructions to secure any additional list of contents but only to have it notarized, which he did, as to the signature of Odis Creel. Whatever instructions Mr. Sasser gave Mr. Stevenson, or the other representative in the office who prepared this proof of loss, must have been verbal as there was no letter offered on behalf of the defendant company in connection with the second proof of loss and instructions for additional information as to the contents of the house.
The facts reveal that Mr. Sasser went to Franklinton and investigated this accident on the 9th day of October, 1959 and he talked to Mrs. Creel and had her give him an itemized list of the contents of the house which is filed in the record, together with a price written opposite each article. This list is in the handwriting of Mr. Sasser and on each page is the signature of Gladys Creel and totaled, according to Mr. Sasser and Gladys Creel, $3400. Mr. Sasser, however, testified that it was not a complete list of of the contents of the house. Mr. Sasser further testified with regard to this list of contents under cross examination, as follows:
"A. I met Mrs. Gladys Creel at the scene of the fire, where the house had been, she drove up in her car and we looked at the ruins and talked about the circumstances of the fire, I then took out this paper and stood at the hood of her car, and she got in and sat in the car, she asked permission to sit in the car, and said she was too nervous to stand, and, as she said, too nervous to talk very much; she gave me this list of items as I remember from her head, she may have had a few items jotted down, and I believe that she said that someone had told her beforehand that the insurance people would be there and would want an itemized list, however, she said she had not gotten an itemized list.
"Q. And she gave you that at that time? A. She did verbatim.

"Q. Now, did you tell her that you required a more detailed list? A. I most certainly did, yes, sir."
Mrs. Creel testified that she remembered discussing with Mr. Sasser the contents of the house and the valuation and that she had given him the list, that he did not request *297 any other articles at that time and said to her, "* * * this is just for the record. You have already turned in as much, or more, than the policy calls for." In other words, it was her testimony and understanding that he didn't want anything except the list which she gave him and he wrote down as she gave it to him together with the values as to the contents of the house and that it totaled $3400 and he told her that it was more than the policy called for and did not request any further articles. In this connection Mr. Sasser denied that he told her she need furnish him no more but testified as to what he told her:
"A. I told her the figure that we had arrived at was over and above the figure of $2500.00, for which her household furniture was insured,"
and again he testified:
"A. We arrived at a figure of some $3400.00, but this was not a figure, this did not cover all the contents, because everything she gave me was not contents."
This testimony is strongly corroborative of Mrs. Creel's version. There is no testimony from Mr. Sasser that he was dissatisfied as to the values placed on the contents which he listed in his own handwriting as it was given to him by Mrs. Creel, in fact, Mrs. Creel testified that Mr. Sasser called her and asked her to make an itemized statement of everything that was in the house, together with the sale price, and that was what she did.
In connection with the defendant's contention, it is well to remember that they were immediately notified of this fire, that within two days Mr. Sasser came up and investigated it, requested a list of the contents of the house which was given to him together with the original cost or value totaling $3400, when the only amount that could be collected for loss of contents was $2500, and, according to the testimony of Mr. Sasser, after securing this detailed list and estimates, he told her, "We will have to get together again and make sure we have all the contents and that we have the right values." From that day on, they were investigating the case and they secured a statement from Mrs. Creel on the 16th of October, 1959 and one from Mr. Creel in November and took his deposition in February of 1960 and objected to the first proof of loss in that it had not been signed before a Notary Public and apparently made no objection to the second proof of loss which they sent to their agent to have signed before a Notary Public in order to correct the deficiency in the first. During all of this time they never told the Creels nor Mr. Stevenson that they were not accepting the list and values of the contents which their agent had requested and obtained from Mrs. Creel. Mr. Stevenson also denies that he was told to have a list annexed to the second proof of loss which he notarized. In addition, they were never told by Mr. Sasser or any representative of the defendant company that they were going to deny the claim on the ground of arson.
By the actions of the defendant company and its agents or representatives, the Creels were lulled into a false sense of security, in that, they had furnished everything that was requested, that they had cooperated fully by statements, depositions, furnishing everything that was required. Furthermore, counsel for the plaintiff asked Mr. Stevenson, the local insurance agent, if proof of loss had been made and he answered in the affirmative because he thought that it had. No complaint was ever made to him about any deficiency in the proof of loss. By such actions the defendant is estopped from questioning the sufficiency of the proof of loss as fulfilling the requirements of the terms of the policy. They could only have attacked the values to show that the contents of the house were less than $2500.
As to the proof of the value of the contents in the house, plaintiff introduced the testimony of Mr. Stevenson, the local insurance *298 agent, representing the defendant company to the effect that he had inspected the house and valued it at $8000 and the contents thereof and valued them at $3000 about the time or during the time he wrote the policy which was four or five months prior to their destruction and loss. Also the proof of loss which the representatives of the defendant company filled out stated the total loss was $10,000.
The cases cited by counsel for defendant as to the failure of the plaintiff to file a proof of loss in accordance with the requirements of the terms of the policy are not apposite. Furthermore, in those cases the value was attempted to be proven by a list showing the cost price. In the present case the value was proven by Mr. Stevenson to be more than the amount of coverage for the loss of the contents of the house.
We now come to the question of penalties and attorney fees under LSA-R.S. 22:658, which states that a failure to make payment within sixty days after receipt of such proof and demand therefor, when such failure is found to be "arbitrary, capricious and without possible cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, * * * together with all reasonable attorneys fees for the prosecution and collection of such loss, * * * provided that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney fees."
We are of the opinion that the testimony which we have previously discussed in detail sufficiently justified a finding by the lower court that the failure of the defendant company to pay this fire loss in full was arbitrary, capricious or without probable cause. They failed to prove a motive. They failed to prove the fire incendiary and, in fact, were told after complete investigation by the State Fire Marshal's office that in their opinion it was accidental. In addition they took statements, depositions and had the full cooperation of the plaintiff and his wife and their local insurance agent, and they made an independent investigation and the facts which they offered in the record to substantiate their charge of arson and to justify their refusal or failure to pay falls far short of complying or satisfying the rule in such cases where the evidence is entirely circumstantial, viz., that a finding for the defendant is warranted only where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire.
Attorneys fees in the sum of $3000 were awarded. We have examined the authorities cited under LSA-R.S. 22:658 and find that generally in the older cases attorneys fees were fixed at 10% to 15%, while in the later cases the fee is twenty to more than thirty per cent. Considering the record and the amount recovered, we are of the opinion that the attorneys fees should be reduced from $3000 to $2000 and accordingly the judgment is amended in this respect.
For the reasons hereinabove given the judgment of the District Court is affirmed, appellant to pay all costs.
Affirmed.